# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 14-60052
Summary Calendar

United States Court of Appeals
Fifth Circuit

**FILED**

August 20, 2014

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CHARLIE HARRIS,

Defendant – Appellant.

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 2:12-CR-77

Before DAVIS, CLEMENT, and COSTA, Circuit Judges.

PER CURIAM:*

Charlie Harris contends that the district court erred by applying a two-level Sentencing Guidelines enhancement for making a credible threat of violence in connection with his drug conspiracy offense. For the following reasons, we AFFIRM.

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 14-60052

## I.

In March 2012, the Bureau of Alcohol, Tobacco, Firearms and Explosives initiated an investigation upon learning through a confidential informant that an individual—later identified as Harris—was attempting to establish a firearms pipeline from Mississippi to California. On May 9, 2012, an undercover ATF agent accompanied the informant to a meeting with Harris and Otis Powell to buy firearms. The agent introduced himself to Harris as a "disgruntled drug courier, who was owed money by the drug organization for whom he delivered cocaine." The agent regaled Harris with a tale of his duties as a drug courier—regularly picking up kilograms of cocaine from stash houses protected by armed guards—and complained that the cartel was not paying him as much money as he deserved. Because of this, the agent said, he was thinking about robbing the cartel of its cocaine the next time that he went to the stash house for a pickup, and was looking for help. Harris responded that he and his associates "hit licks," had the "tools," and would help the agent rob the stash house.

The next day, Harris and Powell met with the agent and the informant to discuss plans for the robbery. The agent said there would be roughly ten kilos of cocaine in the stash house, which would be guarded by armed men. Harris and Powell assured the agent they were ready and willing to rob the stash house and explained their plan for the robbery. First, the agent would go into the stash house. Next, Harris, Powell, and another accomplice would rush in with guns drawn, take control of the room, and make the guards lay down on the floor. Harris then commented that once the guards were subdued, they would "just go and do them."

Harris and Powell met with the agent again on June 5, 2012 to finalize plans for the robbery. The agent explained that they would be ready to do the robbery on June 7, and asked if anyone else would be joining them.

No. 14-60052

Harris said they would be joined by "Cat," later identified as Rallen Ryan Marshall. Powell assured the agent that "Cat" was both reliable and in agreement with the plan to "kill everyone in there."

On June 7, Harris, Powell, and Marshall met the agent at a prearranged meeting place in Tunica, Mississippi so they could travel to the stash house together. Harris, Powell, and Marshall arrived at the meeting place in a car together, bringing three guns with them: a Smith & Wesson .40 caliber pistol loaded with nine rounds of ammunition, a Smith & Wesson 9mm pistol loaded with nine rounds of ammunition, and a Chinese Model SKS 7.62 x 39mm rifle with a bayonet attached to the end and loaded with ten rounds of ammunition. When they arrived, Harris and Powell introduced the agent to Marshall (aka "Cat"). The agent again explained that the stash house would have at least ten kilos of cocaine inside along with three armed guards. Marshall asked tactical questions about how the robbery would be conducted and suggested some best practices, including code words for the agent to describe where the guards were located in the house, leaving the door unlocked, and repeatedly stressing to the agent that he needed to be on the floor when he, Powell, and Harris entered the house. Marshall assured the agent that once he advised that everything was "all good," they would be "coming off in that bitch."

Having gone over the entire plan, the four men moved from the meeting location to a storage locker facility where the agent said he parked a rental vehicle for the group to drive to the robbery. Upon arriving at the storage shed, Harris moved the guns from Marshall's car into the rental vehicle in preparation for the drive to Southaven, Mississippi to rob the stash house. Once Harris transferred the guns to the rental vehicle and they opened the storage shed, the three men were arrested by an ATF special operations team.

3

No. 14-60052

After an indictment charged Harris with drug and firearms offenses, he pleaded guilty to a single count of conspiracy to possess with intent to distribute more than five kilograms of cocaine. The Presentence Report (PSR) assigned Harris a total offense level of 33. In combination with his criminal history category of I, that offense level produced a guidelines range of imprisonment from 135 to 168 months. Harris's offense level included a two-level enhancement under U.S.S.G. § 2D1.1(b)(2) for making a credible threat to use violence in connection with the offense. Harris objected to that enhancement's inclusion in the presentence report (PSR) and renewed his objection at sentencing. The district court overruled the objection and sentenced Harris to a prison term of 135 months.

## II.

Harris contends that the district court incorrectly applied the two-level enhancement for "a credible threat to use violence." U.S.S.G. § 2D1.1(b)(2). Section 2D1.1(b)(2) provides that a defendant's offense level is increased by two levels if he "used violence, made a credible threat to use violence, or directed the use of violence." U.S.S.G. § 2D1.1(b)(2). Harris argues that because there was no actual drug stash with armed guards, the threat of violence was not credible.

Of course, factual impossibility is not a defense to the conspiracy crime itself. *See United States v. Burke*, 431 F.3d 883, 886 (5th Cir. 2005) ("[F]actual impossibility does not preclude a conviction for conspiracy or attempt." (citing *United States v. Pietri*, 683 F.2d 877, 879 (5th Cir. 1982)). It would be odd if the plan to rob cocaine from a nonexistent stash house could give rise to a criminal conviction carrying punishment up to life in prison, *see* 21 U.S.C. §§ 841(b)(1)(A), 846, but could not be considered in sentencing enhancements for that offense.

4

No. 14-60052

Nor does Harris's argument find any support in the language of § 2D1.1(b)(2) or its purpose. The enhancement focuses on the threat being "credible." That is naturally read to mean "believable." Black's Law Dictionary 448 (10th Ed. 2014) (defining "credibility" as "[t]he quality that makes something (as a witness or some evidence) worthy of belief"). The extensive discussion, planning, and partial carrying out of the plan in a vehicle loaded with guns and ammunition demonstrate that the threat was seriously intended, rather than offhand or in jest. Moreover, the enhancement's view that higher sentences are warranted for those with a propensity for violence—even if just reflected in a threat and not an actual act of violence—is implicated even when the threat occurs in connection with a sting.

Because of the extensive evidence demonstrating that the conspiracy offense involved a "credible threat to use violence," the district court did not clearly err in applying the enhancement.

**III.**

The district court's judgment is AFFIRMED.