# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-10644

United States Court of Appeals
Fifth Circuit

**FILED**

July 21, 2020

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

HERMAN SANDERS, also known as "Pooh"; DEMARCUS DAVIS, also known as Zigg; PIERRE LAGRONE, also known as "P", also known as "Pedro",

Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Texas

Before JOLLY, GRAVES, and DUNCAN, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

A jury convicted Pierre Lagrone, Demarcus Davis, and Herman Sanders for several offenses related to the sex trafficking of underage females. On appeal, Davis and Lagrone contend that it was error to join them in the same indictment, asserting that the only connection between their offenses was a common victim—Jane Doe 2. Sanders challenges his conviction for the production of child pornography, arguing that the district court impermissibly allowed the government to constructively amend the allegations in the indictment. We affirm Lagrone's and Davis's convictions. But, because there was a constructive amendment of the production of child pornography count

No. 18-10644

against Sanders, we reverse and vacate his conviction for the production of child pornography and remand for further proceedings not inconsistent with this opinion.

I.

The following facts are taken from the allegations in the third superseding indictment and Jane Doe 2's testimony at trial. Pierre Lagrone and Demarcus Davis were rival pimps who profited from trafficking underage females to engage in sex acts. Herman Sanders is Lagrone's friend and assisted Lagrone in his trafficking of underage females.

Although Lagrone and Davis did not work together, they had at least one underage victim in common—Jane Doe 2. When Jane Doe 2 was seventeen, she ran away from home along with her sixteen-year-old friend Jane Doe 4. Jane Doe 2 then called her friend Jane Doe 6 and asked her if she knew of a place where Jane Does 2 and 4 would be welcome. Jane Doe 6 gave Jane Doe 2 Lagrone's contact information and explained that, if the girls went with him, they would be required to perform commercial sex acts. After Jane Does 2 and 4 contacted Lagrone, he sent Sanders to pick them up. Sanders then took Jane Does 2 and 4 to a Super 8 motel. On their way to the motel, Jane Does 2 and 4 lied to Sanders about their ages and told him that they were eighteen. After arriving at the motel, Sanders informed the teenagers that he needed to take nude photos of them to advertise their services on Backpage.com. Once he took the pictures of Jane Does 2 and 4, Sanders had sex with them.

Jane Doe 4 left the motel and returned to her family before Lagrone advertised her for commercial sex. But, several days after Jane Doe 2 arrived at the Super 8, Lagrone began to advertise her on Backpage. Jane Doe 2 then began seeing customers, whom she refers to as "tricks," and gave most of the money she earned to Lagrone, whom she considered her pimp. At some point, Jane Doe 2's sixteen-year-old friend, Jane Doe 5, joined her at the Super 8.

No. 18-10644

Lagrone began to advertise Jane Does 2 and 5 as "a two-girl show" on Backpage with the idea that they "would do a trick together." Jane Does 2 and 5 ended up taking one call together. Following that call, Jane Doe 5's sister located the girls, took Jane Doe 5 home, and called the police. The police arrested Jane Doe 2 and took her into custody for thirty days due to an outstanding juvenile warrant. Several weeks after she was released from custody, Jane Doe 2 went back to Lagrone. Jane Doe 2 then began seeing around five customers a day.

Lagrone was rarely violent with Jane Doe 2. But on one occasion, Jane Doe 2 called Lagrone a name, and he responded by hitting her on the side of her face. Soon after this incident, Jane Doe 2 left Lagrone to work for Davis. Davis advertised Jane Doe 2 on his Backpage account and arranged for her to see customers. After three days with Davis, Jane Doe 2 left him to go back to Lagrone. Jane Doe 2 then went back-and-forth from Lagrone to Davis at least four times in a period of six weeks.

When Jane Doe 2 was with Davis, he was violent on several occasions. On one such occasion, Davis drove Jane Doe 2 to a church near the Motel 6 where they were staying, pulled out a gun, and forced Jane Doe 2 to take off her clothes and stand outside the car. Jane Doe 2 also witnessed Davis and Lagrone be violent towards each other. During one of the incidents when Jane Doe 2 left Davis for Lagrone, Lagrone, and several of his associates, came to retrieve Jane Doe 2 from the motel where she was staying with Davis. Davis caught wind of Jane Doe 2's plans and, according to Jane Doe 2, started "skipping" towards Lagrone's car. Lagrone then started shooting at Davis, who responded by grabbing Jane Doe 2 and running inside the motel.

II.

On October 10, 2017, a criminal complaint was filed in the Northern District of Texas against, among others, Lagrone, Davis, and Sanders. An original indictment was filed in December 2017. On March 21, 2018, two days

3

before trial, the government obtained a third superseding indictment against Lagrone, Davis, and Sanders. This indictment, which was the operative indictment at trial, had nine counts. The indictment charged Lagrone and Sanders with one count of conspiracy to engage in sex trafficking of children (Count One). Lagrone was also charged with sex trafficking Jane Does 2, 4, 5, and 6 (Counts Two–Five) and with possessing child pornography (Count Six). Davis was charged with one count of sex trafficking Jane Doe 2 (Count Seven). In addition to the conspiracy charge, Sanders was charged with one count of producing child pornography (Count Eight) and one count of possessing child pornography (Count Nine). Notably, unlike in previous indictments, the government did not charge Davis with conspiring with Lagrone and Sanders.

The defendants were arraigned on the third superseding indictment immediately before jury selection began. Following the rearraignment and jury selection, the defendants' trial was held and continued for four days. Jane Doe 2, who was able to testify about most of the events that gave rise to the defendants' criminal charges, was the government's star witness. At the time of trial, Jane Doe 2 was facing armed robbery charges in Louisiana. Because of the pending armed robbery charges, Jane Doe 2 was kept in a holding cell before she met with prosecutors to prepare for the trial. Jane Doe 2 testified that, while in the holding cell, she encountered the defendants, who tried to talk to her about this case. If the defendants were attempting to intimidate Jane Doe 2 into silence, they appear to have been unsuccessful because at trial she provided extensive testimony about how she was sex trafficked.

After the government rested its case, Sanders moved for a judgment of acquittal on both the child pornography production and child pornography possession counts against him, arguing that the government had failed to prove that he knew Jane Does 2 and 4 were under the age of eighteen when he took the nude photos of them. With respect to the production of child

pornography count, Sanders noted that the government had charged that he "did knowingly employ, use, persuade, induce, entice or coerce two minor females . . . to engage in sexually explicit conduct" but that Jane Doe 2 had testified that she and Jane Doe 4 had lied to Sanders about their ages. The district court denied the motion. The district court also denied Sanders's request that the jury be instructed that the government had to prove that he knew that Jane Does 2 and 4 were minors to convict him of the production of child pornography. Instead, the district court instructed the jury that the government did "not have to prove that Sanders knew Jane Doe 2 or Jane Doe 4 were under the age of 18 at the time he is alleged to have taken the [photographs]."

After the trial concluded, the jury found Lagrone guilty of conspiring to engage in sex trafficking under Count One of the indictment. The jury also found Lagrone guilty of sex trafficking Jane Does 2, 4, and 5. The jury acquitted Lagrone of sex trafficking Jane Doe 6 and of possessing child pornography. The jury convicted Davis of sex trafficking Jane Doe 2. The jury convicted Sanders of the production of child pornography but acquitted him of the possession charge. The government agreed to dismiss the conspiracy to engage in sex trafficking count against Sanders because he had previously pled guilty to a similar charge in a different charging document.

At sentencing, the district court sentenced Lagrone to four concurrent terms of life imprisonment. The district court sentenced Davis to a term of life imprisonment. The district court sentenced Sanders to serve a term of 420 months' imprisonment. This timely appeal followed.

No. 18-10644

III.

On appeal, Davis and Lagrone allege that they were misjoined.[1] Sanders asserts that the district court erred by permitting the jury to convict him of the production of child pornography count regardless of his knowledge of Jane Does 2 and 4's ages. According to Sanders, the discrepancy between the allegation that he acted "knowingly" and the government's proof at trial amounted to a constructive amendment of the indictment. Sanders also contends that the district court erred in denying his motion for judgment of acquittal with respect to the production of child pornography count.

A.

We first consider Davis and Lagrone's misjoinder argument under Federal Rule of Criminal Procedure 8(b). That Rule provides that "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). "Whether joinder is proper is normally determined from the allegations in the indictment." *United States v. McRae*, 702 F.3d 806, 820 (5th Cir. 2012) (quoting *United States v. Posada-Rios*, 158 F.3d 832, 862 (5th Cir. 1998)). Although the parties dispute the standard of review for this issue, we would reach the same result under any standard of review, so we will review Davis and Lagrone's misjoinder argument de novo. Under de novo review, "we may affirm if we find that misjoinder occurred but that the error was harmless." *Id.*

---

[1] Davis also has filed a *pro se* motion requesting that we relieve his court-appointed counsel, appoint him new counsel, suspend the appeal, and provide him with a copy of the record. We deny Davis's motion. To the extent that Davis seeks to assert an ineffective assistance of counsel claim, we lack the factual record to adjudicate this claim on direct appeal. *See United States v. Miller*, 406 F.3d 323, 335–36 (5th Cir. 2005). Thus, if Davis wishes to proceed with such a claim, he will need to file a motion to vacate, set aside, or correct his sentence in the district court. *See* 28 U.S.C. § 2255.

## No. 18-10644

We question whether Davis and Lagrone were misjoined. Although the indictment did not charge the two men with participating in the same acts or being members of the same conspiracy, the indictment alleged a greater connection between Davis and Lagrone than simply that they both victimized Jane Doe 2. The indictment also included allegations that Davis and Lagrone "were rival pimps, who competed for certain underage girls" and described the incident when Lagrone attempted to shoot Davis in a dispute over control of Jane Doe 2. These allegations may well have been sufficient to establish that Davis and Lagrone participated in the same series of acts or transactions. *See Posada-Rios*, 158 F.3d at 862 ("Rule 8 is construed liberally in favor of initial joinder.").

But even assuming that the district court erred, reversal is warranted "only if the misjoinder result[ed] in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *See United States v. Lane*, 474 U.S. 438, 449 (1986) (internal quotations and citations omitted). As we will explain, Davis and Lagrone have failed to persuade us that their joint trial had a "substantial and injurious effect" on the verdict. *See id.* We discuss the potential prejudice suffered by each defendant in turn.

1.

We turn first to Davis. Davis argues that the alleged misjoinder resulted in actual prejudice for two reasons: (1) there was a risk of a spillover effect from Jane Doe 2's testimony, and (2) the testimony about the holding cell incident made it appear that he was working with Lagrone and Sanders.[2] Although Davis and Lagrone were charged with committing similar offenses against Jane Doe 2, we are not convinced that any spillover effect influenced the

---

[2] Davis makes no misjoinder argument specific to Sanders. Thus, the focus of our analysis is on Davis being jointly tried with Lagrone. But our reasoning applies with equal force to the joinder of Davis and Sanders.

outcome of the trial or verdict.  As detailed above, Jane Doe 2 testified that Davis advertised her for commercial sex on his Backpage account, arranged her appointments with customers, and set the rates that she was to charge customers.  This testimony, which Davis does not challenge, provided overwhelming evidence that Davis was guilty of sex trafficking Jane Doe 2.

Further, the evidence against Lagrone and Sanders was "distinct and easily segregated from evidence relating to" Davis.  *Lane*, 474 U.S. at 450 n.13. Jane Doe 2's testimony provided a coherent narrative of the events that gave rise to the charges in this case and carefully distinguished the acts of Lagrone and Sanders from the acts of Davis.  Moreover, it is improbable that the jury attributed Lagrone's trafficking of Jane Does 4 and 5 to Davis when there was no allegation that Davis ever interacted with these two victims or worked in partnership with Lagrone.

And, even if the spillover effect did present some risk of prejudice, we are confident that the prejudice was sufficiently cured by the district court's limiting instructions.  The district court instructed the jury that "[t]he case of each defendant should be considered separately and individually" and that the jury "must give separate consideration to the evidence as to each defendant." We are to presume that the jury followed these instructions when reaching its decision.  *See United States v. Nieto*, 721 F.3d 357, 371 (5th Cir. 2013).  The jury's mixed verdict, which acquitted Lagrone of sex trafficking Jane Doe 6 and acquitted Lagrone and Sanders of the possession of child pornography, gives us good reason to believe that the jury did follow these instructions when deliberating.  We thus conclude that Davis suffered no actual prejudice from a spillover effect.

We also fail to see how Jane Doe 2's testimony about the holding cell incident demonstrates that the alleged misjoinder actually prejudiced Davis. Jane Doe 2 testified that during this incident, Davis talked to her about this

case and told her that he would "plead guilty to the pimp part but . . . not . . . to the gun charge."[3]  This evidence, which could suggest that Davis tried to interfere with Jane Doe 2's testimony, would have been admissible against him even if Lagrone and Sanders had not been his codefendants.  Although Jane Doe 2 also testified that Sanders said that she should deny that he took the nude pictures of her, the district court's instruction that the jury separately consider the evidence against each defendant sufficiently minimized the risk that this statement would prejudice Davis.  *See United States v. Mitchell*, 484 F.3d 762, 775–76 (5th Cir. 2007).  Finally, we disagree that the holding cell incident caused the jury to think that Davis acted in concert with Lagrone when he trafficked Jane Doe 2.  Jane Doe 2 testified that Davis and Lagrone worked independently.  We have been given no reason to believe that the jurors rejected this testimony, much less that they rejected it because of Jane Doe 2's testimony about what they told her in the holding cell.  Consequently, Davis has failed to demonstrate that he suffered actual prejudice from the alleged misjoinder.

2.

We next turn our attention to whether the alleged misjoinder prejudiced Lagrone.  Like Davis, Lagrone argues that he was prejudiced by a spillover effect of the evidence against Davis and, in particular, the testimony about the holding cell incident.  He further argues that he was prejudiced by Jane Doe 2's testimony about Davis's violence towards her.

As with Davis, there is overwhelming evidence that Lagrone sex trafficked Jane Doe 2.  Jane Doe 2 testified that Lagrone advertised her on Backpage, collected most of the money she received from customers, and, at

---

[3] There was no gun charge filed against Davis in this case.  Thus, it is unclear what he meant when he told Jane Doe 2 that he was "not pleading guilty to the gun charge."

times, had her seeing five customers a day. Although Lagrone argues that Jane Doe 2 lacks credibility because she is no stranger to the criminal justice system, he has not pointed us to any evidence that contradicts her testimony. To be sure, there was less substantial evidence that Lagrone trafficked Jane Does 4 and 5. But Lagrone has failed to explain how his joint trial with Davis caused the jury to convict him of trafficking Jane Does 4 and 5. Further, as explained above, the testimony presented at trial was not particularly complex or susceptible to jury confusion. We are thus skeptical that there was a spillover effect that "had substantial or injurious effect" on the jury's decision to convict Lagrone. *Lane*, 474 U.S. at 449. And, even if there were a risk that Lagrone would be prejudiced by a spillover effect, the limiting instructions that we have discussed were sufficient to cure that prejudice.

We also conclude that the holding cell testimony did not result in actual prejudice to Lagrone. The only difference between Lagrone's and Davis's holding cell incident arguments is that Lagrone contends that he was prejudiced because he never attempted to influence Jane Doe 2's testimony. As Lagrone notes, the only specific statement that Jane Doe 2 alleged he made during the holding cell incident was that "I forgive you for everything that you are doing . . . ." At sentencing, the district court concluded that this statement was insufficient to support an obstruction of justice sentencing enhancement against Lagrone. We agree that there was little to no evidence that Lagrone made this statement in an attempt to influence Jane Doe 2's testimony.

But, even though certain portions of Jane Doe 2's holding cell incident testimony lumped all three defendants together, we are unconvinced by Lagrone's argument that this testimony resulted in actual prejudice to him. We reach this result because the amount of time Jane Doe 2's testimony was devoted to discussing the holding cell incident pales in comparison to the time she spent providing specific and detailed testimony about Lagrone's sex

trafficking of her.  In the light of the overwhelming evidence of Lagrone's guilt, it seems clear to us that the holding cell incident was not foremost in the jurors' minds when convicting him.  And, in any event, the most incriminating statement alleged to have been made during the holding cell incident came from Sanders, explicitly asking Jane Doe 2 to lie.  Lagrone concedes that he was properly joined with Sanders, so even if Lagrone and Davis had not been joined in the same indictment, Lagrone would have had to contend with Sanders's holding cell comment at trial.  It is implausible that the additional testimony about Davis's statement, which contained a more subtle attempt to influence Jane Doe 2's testimony than Sanders's comment, affected the jury's view of this incident or changed the outcome of the proceedings against Lagrone.

We additionally conclude that Jane Doe 2's testimony about Davis's violence was not so prejudicial to Lagrone that it had a "substantial and injurious effect or influence on the jury's verdict." *Lane*, 474 U.S. at 449.  To be sure, Jane Doe 2 testified that Lagrone was rarely violent, but that Davis often acted aggressively.  And, because Lagrone and Davis were both accused of trafficking Jane Doe 2, there was some risk that Davis's violence would be attributed to Lagrone.  But the district court's jury instructions adequately mitigated this risk.  In addition to its general instruction that the jury "must give separate consideration to the evidence as to each defendant," the district court also specifically instructed the jury that the testimony about Davis's violence should be considered only against Davis.  The giving of this specific instruction, combined with the fact that there was overwhelming evidence that Lagrone trafficked Jane Doe 2, convinces us that the testimony about Davis's violence did not result in actual prejudice to Lagrone.

In sum, the district court "ably parsed" the evidence and took measures "to assure a fair trial for all parties and to minimize any spillover effect from

No. 18-10644

the . . . joint trial." *Posada-Rios*, 158 F.3d at 865. Thus, even if Davis and Lagrone were misjoined, that error was harmless. We therefore affirm Davis's and Lagrone's convictions.[4]

## B.

We now turn to Sanders's argument that the district court, in rulings we subsequently discuss, allowed the government to constructively amend the production of child pornography count in the third superseding indictment. We review this preserved argument de novo. *See United States v. Bennett*, 874 F.3d 236, 256 (5th Cir. 2017).

Section 2251 of title 18 makes it a crime when "[a]ny person . . . employs, uses, persuades, induces, entices, or coerces any minor to engage in . . ., with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct . . . ." *See* 18 U.S.C. 2251(a). This crime thus includes no requirement that a defendant know his victims' ages. *See United States v. Crow*, 164 F.3d 229, 236 (5th Cir. 1999). Accordingly, in discussing the production of child pornography count against Sanders, the district court instructed the jury that "[t]he Government does not have to prove that Sanders knew Jane Doe 2 or Jane Doe 4 were under the age of 18 at the time he is alleged to have taken the [photographs]."

But, the terms of the statute aside, the indictment itself specifically charged that Sanders "did *knowingly* employ, use, persuade, induce, entice or

---

[4] Davis and Lagrone have alternatively appealed the district court's denial of their motions to sever under Federal Rule of Criminal Procedure 14(a), which provides that "[i]f the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant . . . the court may . . . sever the defendants' trials . . . ." Fed. R. Crim. P. 14(a). "To demonstrate that the court abused its discretion in denying [a] motion for severance, the defendant bears the burden of showing specific and compelling prejudice that resulted in an unfair trial, and such prejudice must be of the type against which the trial court was unable to afford protection." *Mitchell*, 484 F.3d at 775 (internal quotations and citations omitted). As explained above, Davis and Lagrone have failed to make this showing.

coerce two minor females . . . to engage in sexually explicit conduct for the purpose of producing any visual depiction of such conduct." (emphasis added). Sanders argues, quite sensibly, that the government must prove the crime charged in the indictment.  Therefore, he says that the district court erred when it did not require the government to prove that he knew Jane Does 2 and 4 were minors.  On the other hand, the government contends that the term "knowingly," as asserted in the indictment, has no application to the charge that Sanders's victims were "two minor females."  Alternatively, the government asserts that the difference between the indictment and the proof offered at trial did not amount to a constructive amendment of the indictment but instead constituted only a variance between the indictment and the proof.

1.

We first consider how the indictment should be interpreted.  Both the government and Sanders agree that it is natural to read the term "knowingly" in the indictment as modifying the verbs "employ, use, persuade, induce, entice or coerce."  But we cannot stop there.  It is grammatically significant to observe that the phrase "two minor females" is the direct object of these transitive verbs.  *See* The American Heritage Dictionary 373 (New College Ed. 1981) (defining "direct object" as "the word or words in a sentence designating the person or thing receiving the action of a transitive verb").  And "where a transitive verb [such as, employ, use, persuade, induce, entice or coerce] has an object [here, two minor females], listeners in most contexts assume that an adverb (such as knowingly) that modifies the transitive verb tells the listener how the subject performed the entire action, including the object as set forth in the sentence." *Flores-Figueroa v. United* States, 556 U.S. 646, 650 (2009).

Accordingly, an objective reader would understand the statement that Sanders "did knowingly . . . persuade . . . two minor females . . . to engage in sexually explicit conduct" to mean that Sanders knew that the individuals he

was persuading were minor females.  We reach this conclusion because it makes little sense to read the indictment as alleging that Sanders knew he had engaged in persuasion but had no knowledge of whom he had persuaded.    To be sure, an allegation of persuasion with no object of that persuasion states no crime.  That is particularly true under this child pornography statute where the victim must be a minor to state an offense.  *See* 18 U.S.C. § 2251(a).  Indeed, we have interpreted language similar to the indictment's charge that Sanders "did knowingly employ, use, persuade, induce, entice or coerce two minor females" to require the government to prove that the defendant thought that he was dealing with a minor.  For example, we have held that 18 U.S.C. § 2422(b), which makes it a crime to "knowingly persuade[ ], induce[ ], entice[ ], or coerce[ ] any individual who has not attained the age of 18 years, to engage in prostitution," requires the government "to prove beyond a reasonable doubt that [the defendant] intended to 'persuade, induce, entice, or coerce' *a person whom he believed to be a minor* into illegal sexual contact."  *See United States v. Barlow*, 568 F.3d 215, 219 (5th Cir. 2009) (cleaned up) (emphasis added). We can see no reason why we should apply a different interpretation to the comparable language in the indictment.  Consequently, our understanding of the ordinary English usage of the adverb "knowingly" leads us to conclude that the most natural reading of the charges is that Sanders knew the objects of his persuasion were minor females.

The government, however, suggests that we should interpret "knowingly" as referring to Sanders's intent to create a sexually explicit visual depiction.  The government concedes, as it must, that if we were to read the term "knowingly" in its suggested manner, as referencing the intent to create a sexually explicit image, we would render the indictment's allegation that Sanders acted "for the purpose of producing any visual depiction of such conduct" redundant since those words ("for the purpose") are allegations of

intent.  We see no reason that such intent should be twice alleged especially when it is far more natural to read "knowingly" as referring to Sanders's knowledge that he had persuaded two minor females to engage in sexually explicit conduct.  Further, even if "knowingly" is read to apply to Sanders's intent to create a visual depiction, the government has failed to explain why we should not also read "knowingly" as applying to the victims' minor status, which appears much closer to the term "knowingly" in the sentence than the allegations related to the production of visual depictions.  For these reasons, we read the production of child pornography count as alleging that Sanders knew Jane Does 2 and 4 were minors.

2.

This conclusion brings us to consider the differences between constructive amendments and variances when comparing the government's proof with the indictment.  "[A] constructive amendment . . . is reversible per se," but "a variance between the indictment and proof [is examined] for harmless error."  *Bennett*, 874 F.3d at 256.  "A constructive amendment occurs when it permits the defendant to be convicted upon a factual basis that effectively modifies an essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that with which [he] was charged."  *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010) (internal quotations and citations omitted).  Otherwise, the amendment is a variance, "and the defendant must show how the variance in the language between the jury charge and the indictment so severely prejudiced his defense that it requires reversal under harmless error review."  *Bennett*, 874 F.3d at 256.

We think that disregarding the indictment's allegation that Sanders knew that his victims were minors constitutes a constructive amendment—not a mere variance.  Our previous analysis established that the indictment

charges Sanders with knowing that the females were minors, and yet, Sanders was convicted with no proof that he knew that Jane Does 2 and 4 were underage. Thus, by instructing the jury that Sanders could be convicted even if he did not know that Jane Does 2 and 4 were minors, the district court permitted Sanders to be convicted under facts different from those charged in the indictment. That is to say, the district court allowed Sanders to be convicted of the offense of production of child pornography generally and not in accord with the indictment's specific accusation that he knew his victims were minors. In similar circumstances, we have concluded that "substantial factual difference[s]" between the allegations in the indictment and proof offered at trial constructively amended the indictment. *See United States v. Nuñez*, 180 F.3d 227, 232–34 (5th Cir. 1999) (finding constructive amendment where indictment charged the defendant with "resisting arrest by means of a firearm" but jury convicted defendant of merely "resisting arrest"); *see also United States v. Salinas*, 654 F.2d 319, 324–25 (5th Cir. 1981) (finding constructive amendment where defendant charged with aiding and abetting bank director's misappropriation of funds but jury instructed that defendant could be convicted for aiding and abetting any of the bank's officers), *overruled on other grounds by United States v. Adamson*, 700 F.2d 953, 965 n.18 (5th Cir. 1983) (en banc).

And, in a case in sync with our case, the Eleventh Circuit has found a constructive amendment when the district court disregarded the indictment's word "willfully" in two money laundering counts, even though willfulness is not an element of money laundering. *See United States v. Cancelliere*, 69 F.3d 1116, 1121–22 (11th Cir. 1995). As the Eleventh Circuit reasoned, "changing the requirement from proof of 'knowingly and willfully' to 'knowingly' impermissibly broadened the bases for Cancelliere's conviction, even though willfulness is not required under the money laundering statute." *Id.* at 1121.

No. 18-10644

The difference between a defendant who knows that he is creating a sexually explicit image of a minor and, on the other hand, one who is able to assume that he is producing adult, not child, pornography is significant enough to conclude that the charges against Sanders were similarly broadened.[5] We thus conclude that Sanders was convicted "on a materially different theory or set of facts than that with which [he] was charged." *McMillan*, 600 F.3d at 451. Accordingly, we reverse Sanders's conviction for the production of child pornography.

C.

We finally turn to the district court's denial of Sanders's motion for judgment of acquittal. Because we have reversed Sanders's conviction for the production of child pornography, we need not further address whether insufficient evidence sustained his conviction. The sufficiency of the evidence argument is relevant, however, in at least one important respect.

If an indictment is "constructively amended by prosecution evidence wholly outside the proper scope of the indictment and/or by a jury charge authorizing a verdict of guilty thereon, but there is evidence within the proper scope of the indictment which supports the verdict, then the normal remedy is to reverse for a new trial." *United States v. Chambers*, 408 F.3d 237, 247 n.6 (5th Cir. 2005). But if there is no evidence to support the factual basis for conviction alleged in the indictment, we are required to reverse the defendant's

---

[5] Of course, we recognize that disregarding surplus facts in the indictment is permissible. *See United States v. Griffin*, 800 F.3d 198, 202–03 (5th Cir. 2015). But that is not what occurred here. Instead of narrowing the crime alleged in the indictment, the district court impermissibly allowed the circumstances for Sanders's conviction to be broadened beyond the facts alleged in the indictment. Indeed, the indictment specifically accused Sanders of acting with knowledge that Jane Does 2 and 4 were minors. But by stating that the jury could disregard whether Sanders knew Jane Does 2 and 4 were underage, the district court broadened the indictment to include allegations that Sanders acted with any *mens rea* that the jury found applicable. "It is this very type of 'broadening' that" constitutes a constructive amendment. *See Nuñez*, 180 F.3d at 233.

conviction and order dismissal of the relevant count on remand. *See id.*; *see also United States v. Adams*, 778 F.2d 1117, 1125 n.13 (5th Cir. 1985) (concluding that retrial was permissible because "the evidence would have been sufficient to convict [the defendant] as charged in the indictment"). Here, Jane Doe 2 testified that she and Jane Doe 4 told Sanders that they were eighteen. The government has pointed to no evidence that contradicts her testimony or that otherwise indicates that Sanders knew that the two teenagers were minors. Thus, because there is no evidence to support the charge of the indictment that Sanders knew that the victims were minors, the district court, on remand, is directed to dismiss with prejudice the production of child pornography count against Sanders.

## IV.

In this opinion we have held: Even if the district court erred in allowing the government to join Davis and Lagrone in the same indictment, that error was harmless. We therefore AFFIRM the convictions of Davis and Lagrone. We have further held that the district court impermissibly permitted the government to constructively amend the production of child pornography charge against Sanders. We therefore REVERSE and VACATE Sanders's conviction for the production of child pornography. As we have explained, there is no evidence in the record to support the indictment's charge that Sanders knew his victims were minors. This case is thus REMANDED for the district court to dismiss with prejudice the production of child pornography count against Sanders and for such further proceedings not inconsistent with this opinion.

AFFIRMED in part; REVERSED and VACATED in part; and REMANDED.