# United States Court of Appeals
## For the Eighth Circuit

_____

No. 21-3763

_____

United States of America

*Plaintiff - Appellee*

v.

Luis Alberto Hernandez-Barajas

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Southern District of Iowa - Eastern

_____

Submitted: December 12, 2022
Filed: June 28, 2023

_____

Before SMITH, Chief Judge, ARNOLD and STRAS, Circuit Judges.

_____

STRAS, Circuit Judge.

Luis Hernandez-Barajas received an enhancement for "direct[ing] the use of violence." U.S.S.G. § 2D1.1(b)(2). The facts support the enhancement, so we affirm.

I.

While in prison for dealing drugs, Hernandez-Barajas continued to run his operation from behind bars. At one point, he arranged for a shipment of marijuana to a relative. But when black-tar heroin arrived instead, Christopher Hicks sold it on his behalf.

The arrangement went so smoothly that they teamed up again to sell methamphetamine. The process was the same each time. Hernandez-Barajas would arrange deliveries to Hicks, who would then sell the drugs. Hicks paid for the drugs in one of three ways: a personal delivery of cash to someone in Hernandez-Barajas's family, a deposit in another inmate's prison account, or a wire transfer to a third party.

Once Hicks quit paying, however, the relationship fell apart. Nonpayment turned into non-responsiveness: Hicks ignored texts and other communications. And Hernandez-Barajas's family got caught "in the middle" of a "danger[ous]" drug dispute.

To protect his family, Hernandez-Barajas pointed the finger at Hicks and passed along his address to their suppliers. He then told Hicks via text that "[t]omorrow at noon a guy is gonna be at [your] house[,] talk to him." When there was no response, he finally said, "[l]isten this is the last tex[t] I will send [you], I can't hold th[ese] people back anymore, and since [you] don't answer my calls [I] am about to [tell] them that [you] don't want to pay and . . . whatever they do after that is on you."

Meanwhile, Hicks continued to sell drugs, including what he received through Hernandez-Barajas. He eventually sold those drugs in controlled buys, which led to federal drug charges. Hernandez-Barajas, for his part, pleaded guilty to a single count of conspiracy to distribute 50 grams or more of methamphetamine. *See* 21 U.S.C. §§ 841(a)(1), (b)(1)(A), 846.

At sentencing, the district court[1] gave him a two-level enhancement for "ma[king] a credible threat to use violence[] or direct[ing] the use of violence." U.S.S.G. § 2D1.1(b)(2).  Hernandez-Barajas challenges the enhancement on appeal.

II.

The question is whether providing a co-conspirator's address to dangerous people "direct[s] the use of violence" or itself conveys "a credible threat to use violence."  U.S.S.G. § 2D1.1(b)(2).  In addressing this question, we review "the district court's interpretation of the [S]entencing [G]uidelines de novo." *United States v. Wattree*, 431 F.3d 618, 621 (8th Cir. 2005).

A.

At the heart of this case is what U.S.S.G. § 2D1.1(b)(2) says.  *See United States v. Clayborn*, 951 F.3d 937, 939 (8th Cir. 2020) ("using the ordinary tools of statutory interpretation" on the Sentencing Guidelines (citation omitted)).  It allows a district court to impose a two-level enhancement when one of three situations arises: "the defendant used violence, made a credible threat to use violence, or directed the use of violence."  U.S.S.G. § 2D1.1(b)(2).

Basic grammar tells us what the sentence means.  *See Nielsen v. Preap*, 139 S. Ct. 954, 965 (2019) ("Words are to be given the meaning that proper grammar and usage would assign them." (brackets omitted) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 140 (2012)).  The sentence's subject, the doer of the action, is the defendant.  *See* Bryan A. Garner, *Garner's Modern American Usage* 918 (3d ed. 2009); *see also* Rodney Huddleston & Geoffrey K. Pullum, *The Cambridge Grammar of the English Language* 230, 235

[1]The Honorable John A. Jarvey, then Chief Judge, United States District Court for the Southern District of Iowa, now retired.

-3-

(2002) (explaining that, in this kind of sentence, the subject causes "an action or event"). There are also three verbs that cover what the defendant must do: use, make, or direct. *See TikTok Inc. v. Trump*, 507 F. Supp. 3d 92, 102 (D.D.C. 2020) ("[V]erbs describe the 'action the subject exerts . . . .'" (quoting *The Chicago Manual of Style* ¶ 5.98 (17th ed. 2017)). And the direct object of each verb involves violence: using it, making a credible threat of it, or directing it. *See* Anne Enquist & Laurel Currie Oates, *Just Writing: Grammar, Punctuation, and Style for the Legal Writer* 166 (3d ed. 2009) (stating that a direct object "receive[s] the action of the verb"); *see also United States v. Sanders*, 966 F.3d 397, 406 (5th Cir. 2020) (explaining the "grammatical[] significan[ce]" of "direct object[s]," which "receiv[e] the action of a transitive verb" (citation omitted)). According to this basic subject-verb-object sentence, it is the defendant who must do one of those three acts,[2] each of which must connect to violence in a specified way. *See The Cambridge Grammar*, *supra*, at 238, 1349.

B.

With those basic grammatical principles in mind, our task is to figure out whether Hernandez-Barajas committed any of the listed acts. The parties agree on one thing: having been in prison at the time, *he* never "used violence" against Hicks. U.S.S.G. § 2D1.1(b)(2); *see The American Heritage Dictionary of the English Language* 1907 (5th ed. 2016) (defining "use" as "[t]o avail *oneself* of" or "[t]o put into service or employ for a purpose" (emphasis added)).

---

[2]When the defendant is not the one who needs to personally perform an act, there are other ways to say so. *See* Scalia & Garner, *supra*, at 170 ("[A] material variation in terms suggests a variation in meaning."). One example is a Sentencing Guidelines provision that has multiple subjects and language making it clear that the defendant is accountable for the acts committed by others. *See* U.S.S.G. § 2D1.1(b)(7) (increasing the offense level by two "[i]f the defendant, *or a person for whose conduct the defendant is accountable* . . . , distributed a controlled substance" in a certain way (emphasis added)).

-4-

Whether Hernandez-Barajas "made a credible threat to use violence" is a closer call. U.S.S.G. § 2D1.1(b)(2). Recall that, grammatically speaking, the defendant is the one who must make the credible threat, even if it involves the potential use of violence by someone else. Our cases reflect this interpretation. Consider *United States v. Lewis-Zubkin*, 907 F.3d 1103 (8th Cir. 2018) (per curiam). There, the defendant threatened to assault two co-conspirators and then paid a third party to do it. *Id.* at 1104. Although the opinion never directly states *which* of the three listed acts the defendant committed, the reasoning suggests that we treated it as a credible threat. *See id.* (citing *United States v. Kirk Tang Yuk*, 885 F.3d 57, 82–83 (2d Cir. 2018), which affirmed a credible-threat enhancement).

Here, by contrast, Hernandez-Barajas never actually threatened Hicks. He demanded "money" and "answer[s]" and told Hicks that "whatever they do after that is on you." But even that final warning does not "express[] . . . an *intention* to inflict pain, harm, or punishment" through the acts of others. *American Heritage Dictionary*, *supra*, at 1813 (emphasis added) (defining "threat").

The government has one last chance to make the enhancement work: showing that Hernandez-Barajas "directed the use of violence" against Hicks. U.S.S.G. § 2D1.1(b)(2). To "direct" means "to dispatch, aim, or guide," so it necessarily contemplates "assist[ing]" or "guid[ing]" someone else. *Webster's Third New International Dictionary* 640 (2002).

The object, at least in the grammatical sense, is "the use of violence." *See Sanders*, 966 F.3d at 406. This noun phrase requires an "application or employment of" violence, no matter who does it. *American Heritage Dictionary*, *supra*, at 1907 (defining the noun form of the word "use"); *cf. Barbato v. Greystone All., LLC*, 916 F.3d 260, 267 (3d Cir. 2019) (reading two statutory definitions differently because "the verb 'to collect' . . . describ[ed] the actions of those it intended the definition to cover, [but] the noun 'collection' . . . did not specify who must do the collecting" (citation omitted)). Putting those pieces together yields a clear meaning: the

-5-

defendant must "assist" or "guide" someone else in the use of violence. *See Sanders*, 966 F.3d at 406; *see also* Enquist & Oates, *supra*, at 166.

It is possible, as the dissent argues, to "guide" someone else in the use of violence through the exercise of authority. But another way to do it, like Hernandez-Barajas did here, is through persuasion or suggestion. As even the dissent's definition recognizes, direction does not *always* require authority. *See Webster's Third*, *supra*, at 640 (defining "direct" as "to request or enjoin *esp[ecially]* with authority" (emphasis added)).

An everyday example proves the point. Imagine that a city snowplow piles snow in front of a driveway. The homeowner comes out and tells the driver to push it somewhere else. The homeowner has no authority over the snowplow or the driver. Yet most people would still conclude that the homeowner "directed" the driver to do something else with it.

The same sort of direction happened here. Once danger came knocking on his family's door, Hernandez-Barajas re*directed* the suppliers' anger toward the person who refused to pay. It was "reasonably foreseeable" that this simple act, given how dangerous they were, could have led to the use of violence against Hicks. *United States v. McDonald*, 43 F.4th 1090, 1098 (10th Cir. 2022) ("[D]irecting the use of violence merely requires that violence be 'reasonably foreseeable' based on [the] defendant's actions." (citation omitted)).

Hernandez-Barajas has a different view. He argues that, at most, he alerted Hicks of potential danger. But what he told Hicks is not what matters. Rather, the focus is on what he told his suppliers, who were trying to get their money. And here, he "directed" them to go after Hicks instead of his own family, fully aware of their intent and ability to do harm. U.S.S.G. § 2D1.1(b)(2); *see McDonald*, 43 F.4th at 1098–99 (affirming a directing-the-use-of-violence enhancement after the defendant told an associate to "handle" a cooperator); *United States v. Perez*, 962 F.3d 420, 451 (9th Cir. 2020) (affirming an enhancement for a defendant who took young gang

-6-

members to a neighboring community and told them to "put in work," which led them to "kill[] a [rival] gang member"). For that reason, the record supports a two-level enhancement for "direct[ing] the use of violence." U.S.S.G. § 2D1.1(b)(2).

III.

We accordingly affirm the judgment of the district court.

SMITH, Chief Judge, concurring.

I concur in the judgment of the court but on a different ground from that stated in its opinion. I would affirm the district court's application of the two-level enhancement because Hicks "made a credible threat to use violence." U.S.S.G. § 2D1.1(b)(2).

Section 2D1.1(b)(2) provides that a two-level enhancement applies "[i]f the defendant used violence, *made a credible threat to use violence*, or directed the use of violence." (Emphasis added.) "[T]he enhancement applies regardless of whether the threatened violence is ultimately carried out." *Lewis-Zubkin*, 907 F.3d at 1104. We review de novo the district court's interpretation of § 2D1.1(b)(2) but its "application of [§ 2D1.1(b)(2)] to the facts for clear error." *United States v. Rutherford*, 599 F.3d 817, 820 (8th Cir. 2010); *see also Lewis-Zubkin*, 907 F.3d at 1104 ("We find no clear error in the district court's application of the § 2D1.1(b)(2) enhancement.").

As the court correctly notes, "[o]ur cases reflect [the] interpretation" that "the defendant is the one who must make the credible threat, even if it involves the potential use of violence by someone else." *See supra* Part II.B (citing *Lewis-Zubkin*, 907 F.3d at 1103–04). The question then becomes whether the record supports a finding that Hernandez-Barajas *threatened* Hicks.

Section 2D1.1(b)(2) does not define "threat." *Cf. United States v. Pineda-Duarte*, 933 F.3d 519, 523 (6th Cir. 2019) ("[T]he Commission chose not to include a definition of 'violence' in § 2D1.1(b)(2)."). Nonetheless, "[d]ictionaries can help fill this interpretive gap." *Id.* (citing *Johnson v. United States*, 559 U.S. 133, 138–39 (2010)). Black's Law Dictionary defines "threat" as follows:

> 1. A communicated intent to inflict harm or loss on another or on another's property, esp. one that might diminish a person's freedom to act voluntarily or with lawful consent; a declaration, express or implied, of an intent to inflict loss or pain on another <a kidnapper's threats of violence>. — threatener, *n.*
>
> .   .   .
>
> 2. An indication of an approaching menace; the suggestion of an impending detriment <the threat of bankruptcy>. 3. A person or thing that might well cause harm <Mrs. Harrington testified that she had never viewed her husband as a threat>. — threaten, *vb.* — threatening, *adj.*

*Threat*, Black's Law Dictionary (11th ed. 2019) (bold omitted).

Case law, albeit noncontrolling, supports application of § 2D1.1(b)(2) when the threats are *implied* rather than *express*. *Tang Yuk*, 885 F.3d at 83 ("That the statements in question could be interpreted as innocent hyperbole . . . does not compel the District Court to draw such a conclusion. Nor was the District Court barred from inferring a threat from Jackson's testimony that inmates had approached him in prison and purported to relay messages from Parrilla. The District Court reasonably took these as both a credible threat to use violence …."); *United States v. Ceja*, 810 F. App'x 477, 478 (8th Cir. 2020) (unpublished per curiam) (holding that the government satisfied its burden of proving by a preponderance of the evidence that the defendant made a credible threat to use violence, based on a cooperating co-conspirator's testimony that (1) the defendant, having become agitated at the co-conspirator's perceived inability to locate either a drug shipment that was to have been sent to a second co-conspirator or the second co-conspirator

himself, showed the first co-conspirator videos of violence inflicted by the drug cartel upon those who were not compliant with its drug dealing activities, and (2) the cooperating co-conspirator viewed the videos as intimidating and that she became especially concerned for the second co-conspirator's safety); *United States v. Cantu*, 765 F. App'x 111, 111 (5th Cir. 2019) (unpublished per curiam) (holding that "the district court reasonably inferred that [the defendant's] statements to the police officers constituted a credible threat to use violence" where the defendant, a gang member, "told two arresting officers that he and the other members of the [gang] knew personal information about them" and "told one officer that he should conceal his face while executing warrants and questioned why the officer continued to work in law enforcement given what the [gang] knew about him").

I conclude that the district court did not clearly err in finding that Hernandez-Barajas's texts to Hicks constituted a *threat*. Once Hicks ceased paying Hernandez-Barajas for the drugs, Hernandez-Barajas responded with a series of text messages, which escalated in tone. Hernandez-Barajas first texted Hicks the following benign messages:

> "I got the gifts ready to send am waiting. Should G send them or not? Let me know A.S.A.P.;" "They calling me and my wife about the money I need the tracking # today;" "Come on bro they put my family in the middle of this and I don't need this u said u get it done today so get it done;" and "Take the money to my wife."

R. Doc. 92, at ¶ 33.

When Hicks did not respond, Hernandez-Barajas texted Hicks:

> "Answer the phone somebody is going to my house tomorrow and am *given them you address no more games* my family is first and you keep lyin to me all in is good to you and *you did me wrong*;" and "*Tomorrow at noon a guy is gonna be at u house talk to him.*"

*Id.* at ¶ 34 (emphases added). After again receiving no response from Hicks, Hernandez-Barajas texted Hicks:

> "I trust you men and put my family in danger what type of sh*t is that;" "I need in answer from u so I can figure things out plus, just find out you have the snow in the way so am gonna give the tracking # to somebody so they can get it because we can't do bussines like that is no trust anymore;" "[Individual #1] is getting out, I will just work with her;" and "*Listen this is the last tex I will send u, I can't hold this people back anymore*, and since u don't anwer my calls am about to told them that u don't want to pay and that's that *whatever they do after that is on you* but they ain't after me because I do anwer the phone when they call hope you have a good year."

*Id.* at ¶ 35 (emphases added) (brackets in original).

Viewing these series of texts in their totality, the district court could reasonably infer that Hernandez-Barajas's statements communicated an intent to inflict harm on Hicks through the acts of others. The texts escalate in tone. The first messages "simply implor[e] Hicks to bring the money to Hernandez-Barajas's wife, to provide a tracking number, and to do so that day." Appellee's Br. at 14. But the next series of texts reflect Hernandez-Barajas's belief that because of Hicks's nonpayment and failure to respond, someone connected with Hernandez-Barajas's drug sources was "going to [Hernandez-Barajas's] house," which jeopardized his own family's safety. R. Doc. 92, at ¶ 34. As a result, he communicated to Hicks that he gave the drug sources Hicks's "address" and that Hicks needed to "talk" to "a guy" who would be visiting him. *Id.* The last text messages "culminate[] in the clearest statement of a threat to use violence." Appellee's Br. at 15. According to Hernandez-Barajas, Hicks's continued nonpayment and failure to respond "put [Hernandez-Barajas's] family in danger" with his drug sources. R. Doc. 92, at ¶ 35. Hernandez-Barajas's statement that he "can't hold this people back anymore," *id.*, could reasonably indicate that he "*had* been holding them … back thus far." Appellee's Br. at 14 (emphasis added). What was Hernandez-Barajas restraining these people from doing? A reasonable inference can be drawn that he had prevented

certain dangerous individuals from physically assaulting Hicks. But because Hicks refused to answer Hernandez-Barajas's calls, Hernandez-Barajas would now permit them to inflict physical harm upon Hicks. *See* R. Doc. 92, at ¶ 35 ("[W]hatever they do after that is on you ….").

The next question is whether the threat is "credible." *See United States v. Harris*, 578 F. App'x 451, 453 (5th Cir. 2014) (unpublished per curiam) ("The enhancement focuses on the threat being 'credible.'"). "['Credible'] is naturally read to mean 'believable.'" *Id.* (quoting *Credibility*, Black's Law Dictionary 448 (10th ed. 2014) (defining "credibility" as "[t]he quality that makes something (as a witness or some evidence) worthy of belief")).

"[T]he district court's finding that [Hernandez-Barajas] made a *credible* threat to use violence was plausible in light of the record as a whole," as set forth *supra*. *Cantu*, 765 F. App'x at 111–12 (emphasis added) (internal quotation marks omitted). While Hernandez-Barajas's texts "could be interpreted as innocent hyperbole," the district court was "not compel[led] … to draw such a conclusion." *Tang Yuk*, 885 F.3d at 83 (concluding it was not clear error for the district court to construe defendant's comments that referenced "driving a car over" another individual as credible threats, even if "the statements in question could be interpreted as innocent hyperbole").

Accordingly, I would affirm the district court's application of the two-level enhancement for having "made a credible threat to use violence." U.S.S.G. § 2D1.1(b)(2).

ARNOLD, Circuit Judge, dissenting.

I conclude for the reasons stated in Judge Stras's opinion that Hernandez-Barajas did not "ma[k]e a credible threat to use violence." But I respectfully disagree that Hernandez-Barajas "directed the use of violence" against Hicks because I can't conclude that the verb "direct" simply "contemplates 'assist[ing]' or 'guid[ing]'

someone else." To my mind, the more "ordinary or natural meaning," *see United States v. Stimac*, 40 F.4th 876, 881 (8th Cir. 2022), of the word in the context of this particular enhancement is "to request or enjoin esp. with authority," "to issue an order to," or "to prescribe esp. by formal or mandatory instruction." *Webster's Third New International Dictionary* 640 (2002). An officer who directs traffic or a conductor who directs an orchestra is telling someone over whom he has authority what to do, and when we remand a case with directions, we are ordering that something be done. So it would seem that the enhancement contemplates that the person doing the directing is telling someone what to do.

Suppose that Hernandez-Barajas's drug suppliers had burst into a convenience store with guns drawn and shouted, "Where's Christopher Hicks?" If, with hands high and hoping to avoid a bullet, the clerk told the supplier that Hicks worked at the convenience store across the street, would he be directing the use of violence? Even if it were "reasonably foreseeable" to the clerk that the robbers would use violence against Hicks using the information he provided, I don't think most people would say that the clerk "directed" the robber to use violence against Hicks. Directing someone to a person against whom he might use violence is fundamentally different from directing someone to use violence against a person. Nor does the record support a reasonable inference that Hernandez-Barajas had authority to direct someone else to use violence against Hicks; in fact, the record suggests the opposite—Hernandez-Barajas was at the mercy of drug suppliers who were looking to him to satisfy certain debts. So I think the enhancement is inapplicable.

At a minimum, I suggest that the rule of lenity is relevant. It won't do simply to settle on a preferred definition without considering the real possibility of alternative ones. Even if the provision at issue is not as clear as I think it is, its meaning is eminently debatable. In short, there is a grievous ambiguity in the text, *see Barber v. Thomas*, 560 U.S. 474, 488 (2010), and so the rule of lenity requires us to come down on the defendant's side. This case exemplifies how the rule is becoming all but extinct, perhaps as a "consequence of zeal to smite the wicked." *See* A. Scalia & B Garner, Reading Law: The Interpretation of Legal Texts 301

(2012). "But a fair system of laws requires precision in the definition of offenses and punishments." *See id.*

I would therefore reverse and remand for resentencing.

_____