# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

February 24, 2026

Lyle W. Cayce
Clerk

———————

No.23-40683

CONSOLIDATED WITH

No.25-40038

———————

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

MARIUS LAZAR,

*Defendant—Appellant*.

———————————————————

Appeals from the United States District Court
for the Eastern District of Texas
USDC No. 1:20-CR-78-3

———————————————————

Before RICHMAN, ENGELHARDT, and WILSON, *Circuit Judges*.

PER CURIAM:[*]

Marius Lazar, a Romanian national, was extradited to the United States and convicted by a jury for partaking in an international conspiracy to purchase cocaine. Lazar challenges his convictions on fifteen grounds. We affirm.

———————————————

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

23-40683
c/w No. 25-40038

**I**

Lazar is a Romanian national and member of the Bucharest charter of the Hells Angels Motorcycle Club (Hells Angels).  Lazar was extradited to the United States and charged with multiple counts of conspiracy related to international drug trafficking and a murder-for-hire.

The conspiracy began in 2020.  In May 2020, DEA Special Agent Christopher Diaz received a tip from a New Zealand prisoner who told him that he knew people who wanted to buy large quantities of cocaine.  Diaz gave the informant his number, and, subsequently, another prisoner in New Zealand, Wen Hui Cui, contacted Diaz with an interest in buying cocaine.  Diaz's cover story was as follows: he would source the cocaine from Peru, ship it to his "ranch" in Beaumont, Texas, hide the cocaine in a "generator," and ship it to New Zealand.  Cui later told Diaz that the generator "should come from [the] USA. The purchase[] [is] made from [the] USA, not Peru. Peru is too hot."

Cui connected Diaz with his outside contact, Murray Michael Matthews, who was a member of the New Zealand Hells Angels.  After Diaz requested a deposit for the cocaine, Matthews sent a screenshot from his compatriot, Marc Johnson, showing that about $30,000 ($50,000 New Zealand dollars) had been wired to a bank account in the United States.

On July 21, 2020, Diaz, Matthews, and Johnson met in Bucharest, Romania, to discuss the deal.  Johnson rejected the option for the cocaine to come straight from Peru to New Zealand and said that the "best" option was for the cocaine to come from the United States.  Diaz again explained a plan to insert the cocaine into a generator and said that he wanted to send the cocaine from the United States to Romania first before shipping it to New Zealand.  The group agreed to ship 400 kilograms of cocaine.

On July 23, 2020, Matthews introduced Diaz to Lazar. Lazar wanted someone killed, and he and Matthews negotiated with Diaz and agreed to pay $20,000 for the murder. Matthews offered to include the $10,000 deposit for the murder with the payment for the 400 kilograms of cocaine.

In addition to the murder-for-hire, Lazar wanted to purchase 10 kilograms of cocaine from Diaz. Matthews later told Diaz that he wanted that 10 kilograms purchase to be put on hold until he could discuss financing with Johnson since Lazar could pay only cash. But Matthews assured Diaz that the hit man was "all locked [i]n and [he would] cover that because that is a must." The target for the murder, according to Matthews, had "talked and [was] bad company so [he] need[ed] to go." The target was a member of a rival motorcycle club and a drug dealer, and Lazar admitted to Diaz that killing the victim would help his own drug sales. Lazar also told Diaz that he wanted to keep the killing "private." The parties communicated about their plans via Wickr Me (Wickr), an encrypted messaging app.

After these initial negotiations, the parties continued to take steps to complete the deal. To prove he was not law enforcement, Lazar delivered a handgun and 100 grams of cocaine to an undercover Romanian police officer posing as Diaz's accomplice. Matthews wired more money to Diaz's bank account in Houston, including the down payment for the hitman. Lazar struggled to pay Diaz the money for his 10 kilograms, but eventually he delivered $150,000 to an undercover officer in Romania. He later asked for an additional 10 kilograms of cocaine, and he negotiated for a different purchase of 100 kilograms of cocaine on behalf of other buyers.

Eventually, Diaz invited Matthews, Johnson, and Lazar to meet in Bucharest in November 2020 to exchange the rest of the money for the cocaine. When the meeting came, Matthews and Johnson did not have the money and explained that they were having trouble moving the money to

Romania.  Lazar helped explain to Diaz that they were trying to get the money to a town in Bulgaria close to the Romanian border.  Matthews said they would have to send someone to get the money across the border, and Lazar explained that it is "not so easy to go in and to go back."  Matthews and Johnson ultimately paid their balance to Diaz with cryptocurrency.  Lazar did not wire any money to the United States.

The next day, Diaz met with Matthews and Johnson and claimed to have killed the victim Lazar wanted murdered.  Matthews and Johnson were then arrested.  Lazar was arrested at the Hells Angels' clubhouse in Bucharest.  Police found cash in the amount Lazar still owed Diaz for his 10 kilograms of cocaine.

After his extradition and trial in the Eastern District of Texas, the jury convicted Lazar of three counts:  (I) "Racketeering Conspiracy," (II) "Conspiracy to Import and Export at Least 5 Kilograms of Cocaine or to Manufacture and Distribute at Least 5 Kilograms of Cocaine Intending, Knowing, and with the Reason to Believe that the Cocaine Will be Unlawfully Imported Into the United States," and (III) "Conspiracy to Commit Money Laundering."  Lazar was sentenced to 300 months of imprisonment.  He raises fifteen issues on appeal.

## II

First, Lazar argues the district court constructively amended the indictment by including a predicate act in the jury instructions that was not properly charged in the indictment.  "We review constructive amendment claims de novo."[1]  "A constructive amendment occurs when it permits the defendant to be convicted upon a factual basis that effectively modifies an

---

[1] *United States v. Jara-Favela*, 686 F.3d 289, 299 (5th Cir. 2012).

23-40683
c/w No. 25-40038

essential element of the offense charged or permits the government to convict the defendant on a materially different theory or set of facts than that with which [he] was charged."[2]

In Count One of the indictment, the government charged a racketeering conspiracy under 18 U.S.C. § 1962(d). Section 1962(d) makes it a crime to conspire to violate the other provisions of § 1962.[3] Here, the government charged Lazar with conspiring to violate § 1962(c), which makes it "unlawful for any person . . . associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."[4] Section 1961 defines racketeering activity to include violations of 18 U.S.C. § 1956 (which criminalizes money laundering)[5] and offenses "involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance . . . punishable under any law of the United States."[6] To prove a *pattern* of racketeering activity, the government must prove "at least two acts of racketeering activity."[7]

In the indictment, the government pointed to the following acts of racketeering activity:

---

[2] *United States v. Sanders*, 966 F.3d 397, 407 (5th Cir. 2020) (alteration in original) (quoting *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010)).

[3] 18 U.S.C. § 1962(d).

[4] *Id.* § 1962(c).

[5] *Id.* § 1961(1)(B).

[6] *Id.* § 1961(1)(D).

[7] *Id.* § 1961(5).

23-40683
c/w No. 25-40038

a. acts indictable under 18 U.S.C. § 1956 (relating to the laundering of monetary instruments);

b. acts involving murder, chargeable under Tex. Penal Code §§ 1.04(a), 15.01, 15.02, 15.03, 19.02, and 19.03; and

c. offenses involving trafficking in controlled substances, in violation of 21 U.S.C. §§ 848(e)(1)(A), 952, 953, 959, 960, and 963.

For (b), the district court held that Texas law would not reach the actions described in the indictment, so the government could not charge a predicate act under the Texas murder laws. However, the government argued in the alternative that the murder-for-hire plot could still be charged as a predicate act under (c) as a violation of 21 U.S.C. § 848(e)(1)(A). The district court initially reasoned:

> [T]o the extent that the Government wishes to support the murder-for-hire plot with § 848(e)(1)(A) such that the scheme still qualifies as a third predicate act—its efforts are unavailing. The First Superseding Indictment alleges three distinct predicate acts to support the RICO conspiracy. The second predicate act, relating to the murder-for-hire plot, is supported by only the Texas Penal Code solicitation offense. The third predicate act, regarding "offenses involving trafficking in controlled substances," is based upon violations of 21 U.S.C. §§ 848(e)(1)(A), 952, 953, 959, 960, and 963. While § 848(e)(1)(A) is alleged in the predicate offense section, it is not alleged to support the murder-for-hire scheme as a predicate act on its own. At this stage, were the Government to attempt to support the second predicate act with § 848(e)(1)(A) at trial (so that it could still prove the RICO conspiracy with any two of the three predicate acts alleged in the indictment), such an effort would equate to a constructive amendment of the indictment.

6

23-40683
c/w No. 25-40038

The government then submitted supplemental briefing on the topic. It explained that while (a)-(c) in the indictment represented different *categories* of predicate acts, those allegations contained more than three distinct predicate acts since a defendant can be charged with a RICO conspiracy for committing two predicate acts in the same category.[8] The government therefore argued that including a jury instruction about § 848(e)(1)(A) would not be a constructive amendment because the indictment included a violation of § 848(e)(1)(A) as a possible predicate act within the category of a drug offense, and nothing stopped the government from using two drug offenses as the required two acts of racketeering activity. The government's argument persuaded the district court, which reversed course and included "Killing While Engaged in Drug Trafficking" under § 848(e) as one of the predicate acts that the jury could use to find Lazar engaged in a racketeering conspiracy.

Lazar argues on appeal, in line with the district court's original ruling, that the inclusion of § 848(e)(1)(A) in the jury instructions amounted to a constructive amendment of the indictment. We disagree. No "essential element of the offense charged" was modified, nor was the government permitted to "convict the defendant on a materially different theory or set of facts" than that which was alleged in the indictment.[9] Lazar could be convicted of two predicate acts of the same type—for example, two acts of drug trafficking. Section 848(e)(1)(A) was clearly included in the list of drug trafficking offenses that the government alleged he committed, and

_____

[8] *See, e.g.*, *United States v. Sutherland*, 656 F.2d 1181, 1186-87, 1189 (5th Cir. Unit A Sep. 1981) (noting that the jury was entitled to find that 25 "individual racketeering acts" were committed when 25 traffic tickets were the subject of bribes to a municipal judge).

[9] *United States v. Sanders*, 966 F.3d 397, 407 (5th Cir. 2020) (quoting *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010)).

§ 848(e)(1)(A), which punishes killing while engaged in a drug conspiracy, covers the murder-for-hire plot. Lazar was on notice that the government could use the murder-for-hire plot to prove a violation of § 848(e)(1)(A), as the government had consistently argued that a violation of § 848(e)(1)(A) could qualify as a predicate act.

To the extent Lazar challenges, in the alternative, the sufficiency of the indictment, "[w]e review the sufficiency of an indictment de novo."[10] "To pass constitutional muster, an indictment must 'allege[ ] every element of the crime charged and in such a way as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding.'"[11] "Although '[i]t is generally sufficient that an indictment set forth the offense in the words of the statute itself,' the indictment must also 'be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense.'"[12] When charging a RICO conspiracy, "the indictment need not contain formal charges of the underlying racketeering activities or articulate the evidence that will be used to prove the allegations."[13] "The Constitution requires only enough specificity to allow the defendant to defend against the allegations."[14]

The indictment alleges the murder-for-hire plot and connects the murder-for-hire plot to the drug trafficking offense. It also lists an offense in

---

[10] *United States v. Pratt*, 728 F.3d 463, 477 (5th Cir. 2013) (citing *United States v. Ratcliff*, 488 F.3d 639, 643 (5th Cir. 2007)), *abrogated on other grounds by*, *Molina-Martinez v. United States*, 578 U.S. 189 (2016).

[11] *Id.* (alteration in original) (quoting *Ratcliff*, 488 F.3d at 643).

[12] *Id.* (alteration in original) (quoting *Hamling v. United States*, 418 U.S. 87, 117-18 (1974)).

[13] *Id.* at 478.

[14] *Id.*

violation of § 848(e)(1)(A) as a charged predicate act. The indictment was sufficiently specific to allow Lazar to defend against the allegations.

Lazar also argues that a violation of § 848(e)(1)(A) is not a proper object of a § 1962(d) conspiracy. He states that § 848(e)(1)(A) is "essentially a sentencing statute" while also recognizing that "the circuits that have discussed this law often refer to it as a substantive criminal offense." We have held that the parallel provision § 848(e)(1)(B) created a substantive criminal offense,[15] and we see no reason to treat § 848(e)(1)(A) differently.

Lazar additionally contends that because § 848(e)(1)(A) requires that a "killing results," there cannot be a conspiracy to commit the offense criminalized by that statute unless a killing results. Lazar does not point to any authority to support this argument. The government cites the Sixth Circuit's decision in *United States v. Snow*[16] in which that court held that the offense set forth in § 848(e)(1)(B) was a proper object of a 21 U.S.C. § 846 conspiracy.[17]

The district court dismissed Lazar's argument:

Lazar's chief argument with respect to § 848(e)(1)(A) is that, in his view, it "only applies if 'the killing results.'" To qualify as a predicate act, it is, in reality, irrelevant that the scheme was not completed in this case. Because Lazar is charged under § 1962(d), it matters only that the predicate acts, "if completed, would satisfy all of the elements of a substantive" RICO offense. *Salinas v. United States*, 522 U.S. 52, 65 (1997).

We agree with the district court. Lazar's argument is without merit.

_____

[15] *United States v. Villarreal*, 963 F.2d 725, 728 (5th Cir. 1992).

[16] 48 F.3d 198 (6th Cir. 1995).

[17] *Id.* at 200-01.

23-40683
c/w No. 25-40038

## III

Lazar argues that his due process rights were violated because there was an insufficient connection between Lazar and the United States that existed only through "manufactured jurisdiction." Lazar challenges both the sufficiency of the indictment and the sufficiency of the evidence. He raised this argument when moving to dismiss his indictment, but the district court was not persuaded. Unlike in the district court, on appeal, Lazar does not challenge the extraterritorial application of any particular law. We thus address only his argument about manufactured jurisdiction.

"This court reviews the district court's denial of a motion to dismiss an indictment de novo,"[18] and we review preserved sufficiency of the evidence challenges de novo.[19] The indictment adequately alleged a jurisdictional nexus, and a rational jury could have found that a sufficient connection to the United States existed.

The "manufactured jurisdiction" argument, which has been raised in other cases, essentially alleges that the federal government violates due process when it "manufactures" a connection to a different geographic location in order to have jurisdiction.[20] The seminal case Lazar and others rely on is the Second Circuit's decision in *United States v. Archer*.[21] In that case, the Second Circuit held there was no interstate jurisdiction when a

---

[18] *United States v. Hernandez Velasquez*, 120 F.4th 1294, 1296 (5th Cir. 2024) (citing *United States v. Villanueva-Diaz*, 634 F.3d 844, 848 (5th Cir. 2011)).

[19] *United States v. Bourrage*, 138 F.4th 327, 348 (5th Cir. 2025).

[20] *See United States v. Clark*, 62 F.3d 110, 111-12 (5th Cir. 1995).

[21] 486 F.2d 670 (2d Cir. 1973).

government agent instigated telephone calls from other states to create jurisdiction and happened to call from another country.[22]

While we have occasionally cited *Archer* when a party has raised this issue, none of those cases found manufactured jurisdiction.[23] In *United States v. Clark*,[24] "an undercover agent for the government requested that [the defendant] transport the stolen vehicles from Texas to a location in Oklahoma for disposition, but [the defendant did] not deny that he willfully and voluntarily complied with the agent's request."[25] In *United States v. Garrett*,[26] we remarked: "Th[e] [government's] preexisting out-of-state operation, combined with the fact that the defendant . . . was aware of the interstate nature of the agents' (fictitious) insurance business when he himself telephoned the agents in California, is sufficient to show that the interstate element was not *solely* furnished by government agents and that the government did not attempt to contrive jurisdiction."[27] In *United States v. Pecora*,[28] the government agent had requested the defendant call him before the agent knew the defendant was in another state, and "there [was] no question of any attempt to contrive jurisdiction."[29] In *United States v.*

---

[22] *Id.* at 681-83.

[23] *Clark*, 62 F.3d at 112, 114; *United States v. Garrett*, 716 F.2d 257, 266, 268 (5th Cir. 1983); *United States v. Pecora*, 693 F.2d 421, 424 (5th Cir. 1982); *United States v. Perrin*, 580 F.2d 730, 736 (5th Cir. 1978), *aff'd*, 444 U.S. 37 (1979).

[24] 62 F.3d 110 (5th Cir. 1995).

[25] *Id.* at 111.

[26] 716 F.2d 257 (5th Cir. 1983).

[27] *Id.* at 267.

[28] 693 F.2d 421 (5th Cir. 1982).

[29] *Id.* at 424.

*Perrin*,[30] we suggested that a government agent could not unilaterally supply an interstate element by, for example, crossing a state line just to call the defendant in another state, but we concluded the government did not manufacture jurisdiction since one of the co-conspirators actively chose to involve an out-of-state supplier.[31]

Here, the indictment alleged a sufficient connection between the co-conspirators and the United States that was not solely furnished by Agent Diaz. The indictment stated that Lazar solicited a murder-for-hire from Diaz who he "knew to use Beaumont, Texas as a base of operations." It also stated that Lazar "negotiated a 10-kilogram cocaine purchase to be exported from Beaumont, Texas, for distribution in Romania." Additionally, it stated that a "member of the conspiracy caused three transactions resulting in the total deposit of approximately $629,182 USD into a Texas-based bank account, intended for withdrawal in Beaumont, Texas." The indictment was sufficient.

As for the sufficiency of the evidence, the evidence at trial demonstrated that Lazar had negotiated a 10-kilogram cocaine deal with Diaz and understood the cocaine would come through Beaumont. One of his co-conspirators rejected the option for the cocaine to come straight from Peru to New Zealand and said that the "best" option was for the cocaine to come from the United States. His co-conspirators also wired money to bank accounts in Texas. Like the agents in *Garrett*, Diaz had a preexisting operation in Texas, and like the defendant in *Garrett*, Lazar was aware of the nature of the drug transaction and the supposed ranch in Beaumont, Texas,

_____

[30] 580 F.2d 730 (5th Cir. 1978), *aff'd*, 444 U.S. 37 (1979).

[31] *Id.* at 736.

when he negotiated a drug deal with Diaz.[32]  Additionally, like in *Clark*, government agent Diaz supplied the plan involving the ranch in Texas and the bank accounts in Texas, but the co-conspirators willfully and voluntarily complied with the plan and his requests for deposits.[33]  The government did not impermissibly manufacture jurisdiction, and there is no due process violation.

## IV

Lazar challenges several of the district court's discretionary decisions, including its (A) admission of recordings and pictures of Wickr message exchanges; (B) refusal to compel the government to disclose the identity of a confidential informant; (C) admission of expert testimony about the Hells Angels; and (D) exclusion of an email about Lazar's Hells Angels status.

## A

Lazar argues that the district court erred (1) by denying his motion to compel a complete set, or a forensic download, of messages exchanged between Agent Diaz and Lazar on Wickr, and (2) by denying his later motion to strike the Wickr messages that had been admitted at trial.  Wickr is a free app that provides military-grade encryption of text, picture, audio and video messages."  Wickr describes its service as follows: "Senders control who can read their messages and how long their message will live for.  Encrypted messages are stored on our servers and are deleted after they are downloaded by the recipient's devices."  Because Wickr messages are deleted after a set period of time, the government gave the defense 254 videos in which Agent

---

[32] *See Garrett*, 716 F.2d at 267.

[33] *See Clark*, 62 F.2d at 111, 114.

23-40683
c/w No. 25-40038

Diaz recorded the messages he exchanged with Lazar and 277 photographs
of the messages.

**1**

Lazar first argues that the district court erred by denying his motion
under Federal Rule of Criminal Procedure 16 to compel "the government to
produce the complete set of the Wickr text messages, or a forensic download
of the phone that was used by the agent." "Upon a defendant's request,"
Rule 16 requires the government to:

> [(1)] disclose to the defendant, and make available for
> inspection, copying, or photographing, . . . any relevant written
> or recorded statement by the defendant if: [the] statement is
> within the government's possession, custody, or control; and
> the attorney for the government knows—or through due
> diligence could know—that the statement exists. . . . [34]

> [(2)] permit the defendant to inspect and to copy or
> photograph books, papers, documents, data, photographs,
> tangible objects, buildings or places, or copies or portions of
> any of these items, if the item is within the government's
> possession, custody, or control and [if several other conditions
> are met].[35]

"We review [the] alleged error[] in the administration of discovery
rules under an abuse of discretion standard and will not reverse on that basis
unless a defendant establishes prejudice to his substantial rights."[36] "A court

---

[34] FED. R. CRIM. P. 16(a)(1)(B)(i).

[35] *Id.* 16(a)(1)(E).

[36] *United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991) (citing *United States v. Garcia*, 917 F.2d 1370, 1374 (5th Cir.1990)).

abuses its discretion when its ruling is based on an erroneous view of the law or on a clearly erroneous assessment of the evidence."[37]

The district court did not abuse its discretion in denying the motion to compel. First, the government did produce the "relevant written or recorded statement[s] by the defendant" that were "within the government's possession, custody, or control"[38] by turning over the videos and photographs of the messages. As the district court noted, Rule 16 "is entirely silent on the issue of the form that [electronic] discovery must take."[39] Lazar contends that some messages were missing, so production of a complete forensic download of the phone was necessary. But since Wickr irretrievably deletes messages, any messages not captured on photo or video are not "within the government's possession, custody, or control" and therefore are not within the scope of Rule 16.[40]

Lazar "maintains that . . . the Wickr messages could easily be saved, downloaded, or extracted for review," and that he "offered trade materials from Wickr indicating that data deleted from the conversation can still be obtained by search warrants . . . [and] also offered trade articles detailing forensic extraction methods of retrieving messages off of the device that used Wickr." Lazar's argument is belied by the record evidence he supplied. Wickr's "Law Enforcement Guidelines" state under the heading "Contents

---

[37] *In re First City Bancorporation of Tex., Inc.*, 282 F.3d 864, 867 (5th Cir. 2002) (quoting *Chaves v. M/V Medina Star*, 47 F.3d 153, 156 (5th Cir. 1995)).

[38] Fed. R. Crim. P. 16(a)(1)(B)(i).

[39] *See also United States v. Warshak*, 631 F.3d 266, 296 (6th Cir. 2010).

[40] *Id.* 16(a)(1)(B)(i), (E); *see also United States v. Sarras*, 575 F.3d 1191, 1215 (11th Cir. 2009) ("[T]he government does not have a duty to disclose items it does not possess. Nor does it have a duty to obtain evidence it does not possess." (internal citations omitted)).

of Communications Are Not Available" that their "response to [a search warrant] will reflect that the content is not stored on our servers or that, in very limited instances where a message has not yet been retrieved by the recipient, the content is encrypted data which is indecipherable." Its guidelines further state it does "not have plaintext copies of [the encrypted] messages exchanged by anybody on our system. [It] also [doesn't] have the keys to decrypt users' communications[, and it] can't read any of the messages sent through Wickr." Even the third-party trade article Lazar supplied says "expired messages cannot be extracted." Rule 16 does not require the government to produce what it cannot possibly produce, so the district court did not abuse its discretion in denying the motion to compel.

### 2

Lazar also challenges the denial of his motion to strike the Wickr messages. After several exhibits of messages were admitted and the government rested, Lazar took the stand and testified that approximately fifteen exculpatory messages were missing. Lazar then moved to strike the admitted messages under Federal Rule of Criminal Procedure 16, *Brady v. Maryland*,[41] Federal Rule of Evidence 901(a) (authentication), and Federal Rules of Evidence 1002 and 1003 (best evidence rules). The parties dispute whether Lazar properly preserved his challenge to the denial of the motion to strike. Assuming without deciding that the issue was preserved, the district court did not abuse its discretion in denying the motion to strike.

On appeal, Lazar's arguments focus only on Federal Rule of Criminal Procedure 16 and Federal Rule of Evidence 901(a). Lazar's Rule 16 challenge

---

[41] 373 U.S. 83 (1963).

23-40683
c/w No. 25-40038

in his motion to strike fails for the same reasons his motion to compel fails, as discussed above.

Regarding Lazar's Rule 901(a) authentication arguments:

> A district court's evidentiary decisions are reviewed for abuse of discretion and any error in admitting evidence is subject to harmless error review. Authentication is a condition precedent to the admission of evidence and is satisfied when a party presents evidence sufficient "to support a finding that the item is what the proponent claims." However, "[t]he standard for authentication is not a burdensome one."[42]

Lazar argues "[t]he government and the trial court take for granted that simply because something appears to be a text-message exchange, it is sufficiently authentic to satisfy the rules of evidence." This argument is misplaced. At trial, Agent Diaz testified that the pictures and videos depicted messages exchanged between himself and Lazar. "Testimony by a witness with knowledge that the 'matter is what it is claimed to be' can be enough to prove the thing's authenticity."[43] The Wickr messages were properly authenticated by Diaz's testimony.[44] The district court did not abuse its discretion in denying Lazar's motion to strike the admitted messages.

---

[42] *United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (alteration in original) (internal citations omitted) (first quoting FED. R. EVID. 901(a); then quoting *United States v. Jackson*, 636 F.3d 687, 693 (5th Cir. 2011)).

[43] *United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009) (quoting FED. R. EVID. 901(b)(1)).

[44] *See United States v. Ramirez*, 658 F. App'x 949, 952 (11th Cir. 2016) (unpublished) (holding that photographs of text messages were properly authenticated when a witness testified and another confirmed that the photos were of messages taken from her phone).

17

23-40683
c/w No. 25-40038

**B**

Lazar also challenges the district court's denial of his motion seeking to require the government to disclose the identity of its confidential informant. The investigation leading to this case began when Agent Diaz was contacted by a tipster called "Lee," a prisoner in New Zealand who put him in contact with his fellow prisoner Cui. At one point, Cui sent Diaz a picture of a letter handwritten in Spanish and signed by Lee. The government produced this letter in discovery. After the government showed a video of the messages containing the letter during trial, the defense moved under *Roviaro v. United States*[45] to require the government to disclose Lee's identity on the grounds that the translation of the letter suggested Lee was an active participant in the conspiracy. The district court denied the motion.

"A district court's decision to grant or deny disclosure of an informant's identity is reviewed for an abuse of discretion."[46] The Supreme Court's decision in *Roviaro* "calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense."[47] To balance these interests, we have developed a three-factor test "to determine whether the identity of an informant should be revealed: (1) the level of the informant's activity; (2) the helpfulness of the disclosure to the asserted defense; and (3) the Government's interest in nondisclosure."[48]

---

[45] 353 U.S. 53 (1957).

[46] *United States v. Ibarra*, 493 F.3d 526, 531 (5th Cir. 2007) (citing *United States v. De Los Santos,* 810 F.2d 1326, 1332 (5th Cir. 1987)).

[47] *Roviaro*, 353 U.S. at 62.

[48] *Ibarra*, 493 F.3d at 531.

18

23-40683
c/w No. 25-40038

**1**

We first consider the level of the informant's activity. The government contends that "Lee made the initial introduction between Diaz and Cui but then, so far as the government is aware, did nothing to participate in the conspiracy or advance the investigation aside from allegedly penning the Spanish letter." Agent Diaz confirmed during trial that this letter related to Lazar's co-conspirators "being concerned they [had] paid [him] their money and yet they [didn't] have any product." Assuming the noncertified translation Lazar supplied was accurate, this letter suggests Lee was more than a "mere tipster," but it remains unclear from the letter whether Lee's involvement was more than "minimal."[49] However, even if this factor weighs in favor of disclosure, Lazar's challenge fails because the other two factors weigh against it.[50]

**2**

For the second factor, the "defendant is required to make a sufficient showing that the testimony would significantly aid the defendant in establishing an asserted defense."[51] Lazar argues that "[Lee's] testimony would have helped the Defense expose Agent Diaz's efforts to route the case through the United States." He also argues that "testimony about Cui and Lee's connections to China and where the money in China came from would

---

[49] *See De Los Santos*, 810 F.2d at 1331 ("[I]f the informant's participation is minimal, it favors nondisclosure. . . . [I]f 'the evidence shows that an informer is a mere tipster, no disclosure of his identity is required.'" (quoting *United States v. Freund*, 525 F.2d 873, 876 (5th Cir. 1976))).

[50] *See id.* at 1333 (finding no abuse of discretion in denying a *Roviaro* motion where the first factor weighed in favor of disclosure but the other two weighed against).

[51] *Id.* at 1331.

23-40683
c/w No. 25-40038

have [sic] materially relevant to establishing that this conspiracy had nothing to do with the Hells Angels."

But Lazar "provides no evidence to support this claim"[52] and does not "identify any specific facts which might be established if [Lee] were required to testify."[53] "[M]ere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure."[54] Additionally, the defense did not cross-examine Agent Diaz about the purportedly relevant information of Lee's involvement in "efforts to route the case through the United States" or "Lee's connections to China."[55] This factor accordingly weighs against disclosure.

**3**

Finally, we weigh the government's interest in nondisclosure. "The government's interest relates to both the safety of the informant and the informant's future usefulness to the authorities as a continuing confidential source."[56] The district court held this factor weighed against disclosure because Lee is currently living in Mexico where he could be subject to retaliation by cartels, and he could also be subject to retaliation by the Hells Angels. "Although the future usefulness of this informant was not discussed, the findings of the court clearly indicate that revealing the identity of the

---

[52] *United States v. Orozco*, 982 F.2d 152, 155 (5th Cir. 1993).

[53] *United States v. Gonzales*, 606 F.2d 70, 76 (5th Cir. 1979).

[54] *Orozco*, 982 F.2d at 155 (alteration in original) (quoting *Gonzales*, 606 F.2d at 75).

[55] *See id.* (noting defense counsel did not question an officer who was available about information that they asserted would be contradicted by the informant's testimony).

[56] *De Los Santos*, 810 F.2d at 1331.

informant would place him in real danger."[57]  This factor therefore weighs against disclosure.

Because the second and third factors weigh against disclosure, even if the first factor weighs in favor, it was not an abuse of discretion for the court to deny the *Roviaro* motion.[58]

## C

Lazar challenges the admission of expert testimony about the Hells Angels.  This court "review[s] the admission or exclusion of expert testimony for an abuse of discretion."[59]  "The district court's ruling will not be disturbed on appeal unless it is manifestly erroneous."[60]  "To be admissible under Rule 702, the court must find that the evidence is both relevant and reliable."[61]

In the district court, Lazar challenged the admissibility of expert testimony by an ATF Intelligence Operations Specialist identified as a "Hells Angels Enterprise Expert" by the government.  The magistrate judge found this testimony was relevant to demonstrating that Hells Angels was an enterprise because he was going to testify "as to the Hells Angels' purpose, its organization, structure, meetings, locations, rules, initiation process, use of violence, drug trafficking, and its characteristics worldwide."  Lazar

---

[57] *Orozco*, 982 F.2d at 156.

[58] *See De Los Santos*, 810 F.2d at 1333 (finding no abuse of discretion in denying a *Roviaro* motion when the first factor weighed in favor of disclosure but the other two weighed against disclosure).

[59] *United States v. Valencia*, 600 F.3d 389, 423 (5th Cir. 2010) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

[60] *Id.* (citing *United States v. Norris*, 217 F.3d 262, 268 (5th Cir. 2000)).

[61] *United States v. Ebron*, 683 F.3d 105, 139 (5th Cir. 2012).

argued then, as now, that the testimony was not relevant because the expert did not have specific knowledge about the Romanian Hells Angels charter. The magistrate judge agreed the expert did not have knowledge about the specifics of the Romanian charter and therefore limited his testimony to speaking "generally about the overall structure of the Hells Angels gang." The magistrate judge still found this testimony relevant because the "average layman" may not understand the "structure, organization, and rules" of an organized crime entity, and the expert also testified that "Hells Angels operates worldwide with the same logo (used as a patch on their clothing), operates under a set of World Rules, and has World Meetings."

We agree this testimony was relevant. The expert could speak about the worldwide scope of Hells Angels and its criminal activity, and Hells Angels was the enterprise at issue in this RICO case. It was not manifestly erroneous for the district court to admit this expert testimony.

## D

Lazar challenges the district court's decision to exclude an email he proffered at trial. "We review evidentiary rulings 'for abuse of discretion, subject to the harmless error standard.'"[62] "A trial court abuses its discretion when its ruling is based on an erroneous view of the law or a clearly erroneous assessment of the evidence."[63]

The email at issue was purportedly from the Hells Angels Bucharest chapter secretary to the national Hells Angels Romanian charter, and it

---

[62] *United States v. Age*, 136 F.4th 193, 227 (5th Cir. 2025) (quoting *United States v. Hankton*, 51 F.4th 578, 598 (5th Cir. 2022)), *cert. denied sub nom.*, *Guillory v. United States*, No. 25-5533, 2025 WL 3198616 (U.S. Nov. 17, 2025), and *cert. denied*, No. 25-5539, 2025 WL 3198615 (U.S. Nov. 17, 2025), and *cert. denied*, No. 25-5556, 2025 WL 3198617 (U.S. Nov. 17, 2025).

[63] *Id.* (quoting *Hankton*, 51 F.4th at 598).

indicated Lazar was "patch in the box" status. Lazar testified that "patch in the box" status meant that he could not serve as an officer, wear symbols of the club, participate in the meetings, or receive usual communications from the club. But he would still have been required to attend the club meetings and could obtain permission to participate in events; he was in a sense demoted to the level of a prospective member of the club.

Lazar argues the email should have been admitted under Federal Rule of Evidence 803(3), the hearsay exception for then-existing mental, emotional, or physical conditions.[64] Rule 803(3) provides that "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health)" is "not excluded by the rule against hearsay," but this exclusion does "not includ[e] a statement of memory or belief to prove the fact remembered or believed."[65]

Here, the statement by the Hells Angels secretary that Lazar was "patch in the box" was not a statement of any motive, intent, or plan, nor did it express the secretary's emotional or physical condition at the time. Instead, it resembles a statement of belief about Lazar's status at the relevant time.[66] The district court did not abuse its discretion in refusing to admit the email under Rule 803(3).

---

[64] *See* FED. R. EVID. 803(3).

[65] *Id.*

[66] *See, e.g.*, *United States v. Shah*, 95 F.4th 328, 374 (5th Cir. 2024), *cert. denied sub nom.*, *Rimlawi v. United States*, 145 S. Ct. 518 (2025) (upholding under Rule 803(3) the exclusion of statements, which included (1) that a "hospital 'only accepts private commercial insurance,' and 'do[es] not accept any federally funded programs and [has] no plans to do it in the future'" and (2) that the hospital "was not 'participating in any federally funded program' or 'affected by stark or anti-kickback issues'").

23-40683
c/w No. 25-40038

To the extent Lazar raises a violation of his Sixth Amendment right to present a complete defense, this court reviews the issue de novo.[67]  Though the email was excluded, Lazar testified about his "patch in the box" status for the jury to consider as part of his defense that he was not involved with the enterprise, and the statements excluded were "simple, run-of-the-mill hearsay statements."[68]  The hearsay rules as applied here did not "infring[e] upon a weighty interest of the accused," nor were they "arbitrary or disproportionate to the purposes they are designed to serve."[69]  Lazar's right to present a complete defense was not violated.

## V

Lazar challenges the sufficiency of the evidence to prove that (A) he conspired with other Hells Angels members and (B) he was a member of an enterprise that affected interstate or foreign commerce.  This court reviews "challenges to the sufficiency of evidence *de novo*, but view[s] the evidence in the light most favorable to the verdict."[70]  This review is "highly deferential to the jury's verdict," and we "will reverse only if no rational jury could have found defendants guilty beyond a reasonable doubt."[71]

---

[67] *United States v. Skelton*, 514 F.3d 433, 438 (5th Cir. 2008).

[68] *Shah*, 95 F.4th at 375.

[69] *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (alteration in original) (internal quotation marks omitted) (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998)).

[70] *United States v. Bourrage*, 138 F.4th 327, 348 (5th Cir. 2025) (quoting *United States v. Sanders*, 952 F.3d 263, 273 (5th Cir. 2020)).

[71] *Id.* (quoting *United States v. Mesquias*, 29 F.4th 276, 279 (5th Cir. 2022)).

**A**

Lazar argues that the evidence was insufficient to prove that he conspired with the New Zealand Hells Angels members and instead showed only that he conspired with a federal agent. Lazar argues the evidence did not prove he joined the drug trafficking conspiracy but rather that he "acting alone, was attempting to commit independent criminal activities in Romania."

Contrary to Lazar's characterization of the evidence, the New Zealand Hells Angels members were more than just "aware" of the agreement between Lazar and Diaz, and the fact that the cocaine purchases were to be paid for separately is not dispositive. The evidence was sufficient for a rational jury to conclude that Lazar joined a conspiracy with Matthews and Johnson. Lazar and Matthews negotiated together with Diaz about the price for the murder-for-hire, and Matthews agreed to cover the down payment for the murder, which he sent to Diaz, along with money for the 400 kilograms of cocaine. Matthews not only paid for a hitman but said that the murder was a "must" and that the target had "talked and [was] bad company so [he] need[ed] to go." Moreover, although Lazar paid separately from Matthews and Johnson for his cocaine, the co-conspirators communicated their concerns to Diaz about Lazar's ability to pay. For example, Matthews told Diaz that he wanted the 10-kilogram deal with Lazar "put on hold" while he discussed with Johnson about whether they would be willing to pay Diaz for that cocaine and pick up Lazar's cash. Matthews also told Diaz that he would do his "best to make [the deal with Lazar] happen" and that he would get Lazar "to get as much [money] as he can." When Lazar was struggling to raise the cash for the 10 kilograms of cocaine, he told Diaz he was "hoping that [Matthews] [would] not blame [sic] so badly for this situation." Diaz later told Matthews he would put the 400 kilograms of cocaine and the 10 kilograms of cocaine into the same shipment. Additionally, during the

25

Bucharest meeting in November 2020, Lazar took an active role in explaining the troubles Matthews and Johnson were having in moving the money they owed Diaz into Romania from Bulgaria.

This evidence is sufficient for a rational jury to conclude that Lazar agreed to "pursue the same criminal objective"[72] with his co-conspirators, and that he made an agreement with Matthews and Johnson, not just Diaz.

## B

Lazar also challenges the sufficiency of the evidence to prove that he was involved in an enterprise that affected interstate or foreign commerce. Lazar does not argue that he is not a member of the Romanian Hells Angels, but contends there was insufficient evidence to show that the Romanian Hells Angels was "part and parcel" with a worldwide Hells Angels network and that the Romanian Hells Angels, as part of that network, affected interstate or foreign commerce.

The government was required to prove that Lazar was "associated with [an] enterprise engaged in, or the activities of which affect, interstate or foreign commerce."[73] "The nexus with interstate commerce required by RICO is minimal."[74] "Drug-trafficking is a type of economic activity that has been recognized to substantially affect interstate commerce in the aggregate."[75]

---

[72] *Salinas v. United States*, 522 U.S. 52, 63 (1997).

[73] 18 U.S.C. § 1962(c).

[74] *United States v. McClaren*, 13 F.4th 386, 402 (5th Cir. 2021) (quoting *United States v. Delgado*, 401 F.3d 290, 297 (5th Cir. 2005)).

[75] *Id.*

The government expert's testimony was sufficient to establish the minimal nexus with interstate commerce needed under RICO. The government's expert on Hells Angels testified as to the worldwide nature of the Hells Angels and its history of criminal activity, even though he was not allowed to testify specifically about the Romanian charter, as discussed above. He explained that there are Hells Angels charters in Romania, Germany, and New Zealand, and that Hells Angels has a presence in six continents. He discussed how Hells Angels members have committed the crimes of drug trafficking, money laundering, and violent crimes and that Hells Angels "highly encourage[s]" violence. This testimony about drug trafficking and money laundering in particular points to Hells Angels's effect on interstate and foreign commerce. Furthermore, he agreed that Hells Angels membership would help someone control the drug trade in a certain area, scare off rivals, and connect them to sources of drugs and weapons. He also testified that Hells Angels groups have "parties or fundraising events" to help pay for members' legal or bond fees, and that sometimes the clubs will "sell Hells Angels indicia . . . to raise funding."

As the government notes, other evidence in this case bolsters the expert's testimony. Matthews traveled to Romania and negotiated a drug deal for cocaine to flow from Peru to the United States, to Romania, and finally, to New Zealand. Matthews and Johnson transferred money internationally. Lazar negotiated a deal for cocaine to be transported internationally to Romania, and he was involved in the discussions about moving money from Bulgaria to Romania. These actions demonstrate coordination by international members of a common enterprise that clearly affects foreign commerce.

Additionally, Lazar told Diaz that he was a founder of the Hells Angels Romania charter and that he represented his "country in a lot of international meetings." He explained that this was the reason he was harassed by the

27

"Fbi, interpol, europol, [sic] every time [he] cross[ed] borders." He also told Diaz: "I think you have an idea how our club [(the Hells Angels)] works[.] That's why I find myself getting involved in a lot of situations, like one you [k]now [of] already[.]"

There was sufficient evidence for a rational jury to conclude that Hells Angels affected foreign commerce and that Lazar was part of that broader enterprise. Despite what Lazar suggests, expert testimony detailing the activities of the Romanian Hells Angels charter was not necessary for the jury to reach this conclusion.

## VI

Lazar challenges whether venue was proper for Count III, conspiracy to commit money laundering. The district court instructed the jury that it could find venue was proper under the high-seas statute, 18 U.S.C. § 3238. That statute provides, in relevant part: "The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought."[76] The district court accordingly instructed the jury:

> [I]f you find that the offense was committed overseas, you may find the venue requirement satisfied if the government proves by a preponderance of the evidence that the defendant was first brought to the Eastern District of Texas; that is, the Eastern District of Texas is the place where the defendant first arrived in the United States.

Lazar challenges this instruction as a matter of law as well as the sufficiency of the evidence showing that venue was proper. "[W]hen 'a jury

---

[76] 18 U.S.C. § 3238.

23-40683
c/w No. 25-40038

instruction hinges on a question of statutory construction, this court's review is de novo.'"[77] "Any error in a jury instruction is subject to harmless-error review."[78]

Lazar contends that § 3238 is inapplicable because the money laundering statute provides an exclusive venue provision in 18 U.S.C. § 1956(i). He explains that when the offense of conspiracy to launder money occurs outside the United States, the government does not have extraterritorial jurisdiction until the requirements of 18 U.S.C. § 1956(f) are met, including that "the conduct occurs in part in the United States."[79] Lazar argues that conspiracy to launder money therefore is not "begun" or "committed" for § 3238 purposes until an overt act occurs in the United States because the government has no extraterritorial jurisdiction to prosecute the offense until then. At that point, there is "no need" to apply § 3238, and so it must not apply.

Lazar's argument is without merit. The Supreme Court has noted that the language in 18 U.S.C. § 1956(i) "appears permissive rather than exclusive—§ 1956(i) says a conspiracy prosecution '*may* be brought' in a district meeting the specified criteria. This suggests that the provision serves to supplement, rather than supplant, the default venue rule."[80] Lazar presents no compelling reason to contradict the Supreme Court's suggestion that § 1956(i) is permissive. The district court did not err in its instruction.

---

[77] *United States v. Lamartiniere*, 100 F.4th 625, 636 (5th Cir. 2024) (quoting *United States v. Garcia-Gonzalez*, 714 F.3d 306, 312 (5th Cir. 2013)).

[78] *Id.* (citing *United States v. Ferris*, 52 F.4th 235, 239 (5th Cir. 2022)).

[79] 18 U.S.C. § 1956(f)(1).

[80] *Whitfield v. United States*, 543 U.S. 209, 217-18 (2005).

His challenge to the sufficiency of the evidence likewise fails. "Where a defendant argues that the government failed to adduce evidence sufficient to support venue for a particular count, 'we view the evidence in the light most favorable to the Government, drawing all reasonable inferences in favor of the verdict.'"[81] As discussed above, the evidence demonstrated that Lazar made an agreement with his co-conspirators overseas, and the evidence established that Lazar was first brought to an airport in Beaumont, Texas, within the Eastern District of Texas. A rational jury could therefore find that venue was proper.

## VII

Lazar challenges the jury instructions on three additional topics: (A) the enterprise element in Count I, (B) the predicate acts in Count I, and (C) the conspiracy in Count III. We "review preserved error in jury instructions under an abuse of discretion standard and ask 'whether the court's charge, as a whole, is a correct statement of the law and whether it clearly instructs jurors as to the principles of the law applicable to the factual issues confronting them.'"[82] Any error is "subject to harmless-error review."[83] "Even 'erroneous jury instructions are harmless if a court, after a thorough examination of the record, is able to conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error.'"[84]

---

[81] *United States v. Solis*, 299 F.3d 420, 444 (5th Cir. 2002) (quoting *United States v. Loe,* 248 F.3d 449, 465 (5th Cir. 2001)).

[82] *United States v. Kay*, 513 F.3d 432, 446 (5th Cir. 2007) (quoting *United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002)).

[83] *United States v. Arthur*, 51 F.4th 560, 567 (5th Cir. 2022) (quoting *United States v. Cessa*, 785 F.3d 165, 185 (5th Cir. 2015)).

[84] *Id.* (quoting *United States v. Stanford*, 823 F.3d 814, 828 (5th Cir. 2016)).

23-40683
c/w No. 25-40038

## A

Lazar challenges part of the jury instruction on the enterprise element in Count I.  Though Lazar claims to challenge a constructive amendment of the indictment, his arguments address the substantive accuracy of the jury instruction.  Lazar argues that the jury instruction did not require the government to prove the independent enterprise element for the RICO offense, instead authorizing the jury to find the existence of an enterprise if the jury found the existence of a conspiracy.  He quotes the following language from the jury instructions: "Common sense dictates that the existence of an association-in-fact enterprise is oftentimes more readily proven by what it does rather than by an abstract analysis of its structure."

The district court's instruction tracks almost exactly one of the instructions challenged in *Boyle v. United States*.[85]  The Supreme Court held:

> [T]he trial judge did not err in instructing the jury that "the existence of an association-in-fact is oftentimes more readily proven by what is *[sic]* does, rather than by abstract analysis of its structure."  This instruction properly conveyed the point . . . that proof of a pattern of racketeering activity may be sufficient in a particular case to permit a jury to infer the existence of an association-in-fact enterprise.[86]

Given that the indictment alleged Hells Angels was an association-in-fact enterprise, under *Boyle*, this was a proper statement of the law applicable to this case.

---

[85] 556 U.S. 938, 942 n.1 (2009) (providing "the relevant portion of the [jury] instructions" which stated "[c]ommon sense suggests that the existence of an association-in-fact is oftentimes more readily proven by what is *[sic]* does, rather than by abstract analysis of its structure." (second alteration in original)).

[86] *Id.* at 951 (first alteration in original) (internal citation omitted).

23-40683
c/w No. 25-40038

**B**

Lazar challenges the predicate act instruction for Count I. He argues that the government alleged the singular predicate act of a drug trafficking conspiracy, which the jury instruction then listed as five predicate acts, constituting a constructive amendment.

The government disputes whether Lazar preserved his constructive amendment objection. However, even if he did, his objection is without merit. The government's indictment listed as predicate acts violations of all the statutes that were used in the jury instructions as possible predicate acts. As discussed above, the government explained to the district court how it had presented categories of predicate offenses in the indictment and that violations of the specific listed statutes within those categories could represent different predicate acts. Lazar was on notice that violations of these statutes could be used to prove the requisite predicate acts. An "essential element of the offense charged" was not modified, nor was the government permitted to "convict the defendant on a materially different theory or set of facts" than that which was alleged in the indictment.[87]

As far as his substantive objection is concerned, even assuming that the instruction constituted an abuse of discretion, it would be harmless error. The jury convicted Lazar of Counts II and III: a violation of 21 U.S.C. § 963 and a violation of 18 U.S.C. § 1956(h), respectively. Violations of both statutes were listed in the indictment and the jury instructions as predicate offenses for Count I. The jury thus necessarily found Lazar guilty beyond a reasonable doubt of at least two predicate acts, making any error harmless.

---

[87] *United States v. Sanders*, 966 F.3d 397, 407 (5th Cir. 2020) (quoting *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010)).

## C

Lazar also challenges part of the jury instruction for Count III. The jury instruction stated that the jury had to find that Lazar and another person "made an agreement to commit the crime of money laundering, that is, to transport, transmit, or transfer, or *attempt to* transport, transmit, or transfer, a monetary instrument . . . ." Lazar cites to *United States v. Meacham*[88] and argues that the district court erred in its instruction since he could not be convicted of a conspiracy to attempt. Even if the district court erred, however, such error is harmless.

In *Meacham*, we interpreted 21 U.S.C. §§ 846 and 963, which both provided at the time of that decision that "[a]ny person who *attempts or conspires* to commit any offense defined in this title is punishable by imprisonment or fine . . . ."[89] The government charged the defendants with conspiracy to attempt substantive offenses, and we held that the statutes did not create this crime.[90] We stated that Congress did not intend to "create four discrete crimes [conspiracy, attempt, conspiracy to attempt and attempt to conspire] with the three words 'attempts or conspires.'"[91]

However, we did "not reach the more elusive question at issue in [the Seventh Circuit's decision in *United States v.*] *Clay*, i.e., whether the government may prosecute the conceptually bizarre crime of conspiracy to attempt in instances where separate provisions make both the conspiracy and

---

[88] 626 F.2d 503 (5th Cir. 1980), *abrogated on other grounds by*, *United States v. Cotton*, 535 U.S. 625 (2002).

[89] *Id.* at 506 (emphasis added) (quoting 21 U.S.C. §§ 846, 963 (1980)).

[90] *Id.* at 505, 509.

[91] *Id.* at 508.

the attempt criminal offenses."[92]  As we described in *Meacham*, the Seventh Circuit in *Clay* "upheld the conspiracy-to-attempt conviction on the grounds that the defendants, whose plot to enter the building was not successful, had 'necessarily contemplated their attempting to gain entry into the building.'"[93]  We did "not fault that reasoning, but note[d] that it would be the height of absurdity to conspire to commit an attempt, an inchoate offense, and simultaneously conspire to fail at the effort."[94]  Yet, the court left open the possibility that Congress could provide for this in a statute, stating "had Congress intended that there be prosecutions for conspiracies to attempt to violate the drug laws, it would have so provided in terms less ambiguous than those found in [§§] 846 and 963."[95]

While 18 U.S.C. § 1956, the money laundering statute, does have separate provisions that make both the conspiracy and the attempt criminal offenses,[96] we need not address in this case whether the statute authorizes

---

[92] *Id.* at 509.

[93] *Id.* at 509 n.7 (quoting *United States v. Clay*, 495 F.2d 700, 710 (7th Cir. 1974)).

[94] *Id.*

[95] *Id.*; *cf. United States v. Dearmore*, 672 F.2d 738, 740 (9th Cir. 1982) (stating that "[i]t is permitted to charge a violation of the general conspiracy statute, 18 U.S.C. [§] 371 (1976), for a plan to violate a specific statutory prohibition defining an attempt offense against the United States" and holding that "[a]ttempts to commit bank robberies are explicitly proscribed by 18 U.S.C. [§] 2113(a) (1976) and therefore are appropriate objects for conspiracy charges"); *United States v. Mowad*, 641 F.2d 1067, 1074 (2d Cir. 1981) (affirming a conspiracy-to-attempt conviction under the general criminal conspiracy provision, 18 U.S.C. § 371, because the indictment "contain[ed] all elements necessary to prosecute a conspiracy: a provision making the act of conspiring a crime and a provision making the object of the conspiracy a crime").

[96] 18 U.S.C. § 1956(h) ("Any person who conspires to commit any offense defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."); *id.* (a)(2) ("Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a

convictions for conspiracy to attempt money laundering. Assuming without deciding that there was error, the error was harmless.

In *United States v. Wilson*,[97] we stated that a "'conspiracy to commit attempted murder' is not a cognizable offense under 18 U.S.C. § 1959, both as a matter of statutory construction and common sense."[98] The statute under which the defendants were charged in *Wilson* is similar to the statutes at issue in *Meacham*.[99] We reasoned and held:

> We find that the indictment for conspiracy to attempt in the instant case was both legally defective and factually unsupported by the evidence. Because the government offered no proof at trial of a conspiracy to attempt, we find that there is no possibility that the jury convicted the defendants on the improper charge and that the plaintiffs [sic] were therefore not prejudiced by the legal error. To the extent that the jury found the defendants guilty of the conspiracy count, they must have based their conviction on the trial evidence of conspiracy to commit murder and assault with a deadly weapon. . . . Where, as in this case, no evidence was ever presented to support the legally flawed charge, there is little danger that the jury convicted on that impermissible ground.[100]

---

place outside the United States or to a place in the United States from or through a place outside the United States . . . .").

[97] 116 F.3d 1066 (5th Cir.), *vacated in part on other grounds sub nom.*, *United States v. Brown*, 161 F.3d 256 (5th Cir. 1998) (en banc).

[98] *Wilson*, 116 F.3d at 1080.

[99] *See* 18 U.S.C. § 1959(a)(5)-(6) (addressing "[v]iolent crimes in aid of racketeering activity" and stating that individuals "shall be punished" "for *attempting or conspiring* to commit murder or kidnapping" and "for *attempting or conspiring* to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury" (emphasis added)); *supra* note 88 and accompanying text.

[100] *Wilson*, 116 F.3d at 1080.

23-40683
c/w No. 25-40038

Similarly, here, the jury did not convict on a ground for which the government did not present evidence. Lazar points to no evidence that the co-conspirators agreed to *attempt* to launder money as opposed to agreeing to launder money. The government presented evidence showing that money was wired to the United States by Lazar's co-conspirators, which proves that there was an agreement to commit money laundering, not merely to attempt it. Therefore, even assuming the instruction was erroneous, it was harmless.

## VIII

Lazar challenges his sentence on various grounds.

## A

Lazar contends that the district court erred in calculating the quantity of drugs involved for sentencing purposes. "[W]e review the district court's . . . findings of fact, including the calculation of drugs attributable to [Lazar], for clear error."[101] "The calculation will be upheld so long as it is 'plausible in light of the record as a whole.'"[102]

Lazar argues that under *United States v. Carreon*[103] he is not responsible for the 400 kilogram cocaine transaction because "[t]he agreement [to distribute the 400 kilograms] . . . was finalized prior to Lazar's introduction to Diaz, and prior to him joining the conspiracy." Lazar is correct that *Carreon* held "that 'relevant conduct' as defined in § 1B1.3(a)(1)(B) is prospective only, and consequently cannot include

---

[101] *United States v. Eustice*, 952 F.3d 686, 690 (5th Cir. 2020) (citing *United States v. Clark*, 389 F.3d 141, 142 (5th Cir. 2004)).

[102] *Id.* at 691 (quoting *United States v. Betancourt*, 422 F.3d 240, 246 (5th Cir. 2005)).

[103] 11 F.3d 1225 (5th Cir. 1994).

conduct occurring before a defendant joins a conspiracy."[104]  But Lazar's argument that he is not responsible because the agreement to distribute the 400 kilograms occurred before he joined the conspiracy is misplaced.  In *Carreon*, we quoted a First Circuit decision that "adequately describe[d] our holding":[105]  "[T]he base offense level of a co-conspirator at sentencing should reflect only the quantity of drugs he reasonably foresees it is [sic] the object of the conspiracy to distribute after he joins the conspiracy."[106]  The rule *Carreon* announced does not depend on when the agreement to distribute drugs is made, but rather on when those drugs are distributed.[107]  Because the 400 kilograms were to be distributed after Lazar joined the conspiracy, and that quantity was reasonably foreseeable to him, it was not clear error for the district court to attribute it to him.

## B

Lazar contends the district court committed two other sentencing errors.  Lazar argues the trial court's calculation of the sentencing guidelines was clearly erroneous for the money laundering offense.  Lazar also challenges the application of the manager/supervisor adjustment, arguing that he sought less drugs than his co-conspirators, joined the conspiracy after

---

[104] *Id.* at 1235-36.

[105] *Id.* at 1237.

[106] *Id.* at 1236 (first alteration in original) (quoting *United States v. O'Campo*, 973 F.2d 1015, 1026 (1st Cir. 1992)).

[107] *Cf. id.* ("[A] new entrant cannot have his base offense level enhanced at sentencing for *drug distributions* made prior to his entrance merely because he knew they took place."(emphasis added) (quoting *O'Campo*, 973 F.2d at 1026)); *cf. also United States v. Davila*, No. 94-50457, 1995 WL 313937, at *18-19 (5th Cir. 1995) (unpublished) ("[T]he 1991 and 1992 heroin sales occurred prior to any agreement between him and Amador to sell drugs. . . . The district court's attribution . . . based upon the transactions that occurred before that date therefore is clearly erroneous.").

23-40683
c/w No. 25-40038

they agreed to distribute the 400 kilograms, lacked access to the same funds as his co-conspirators, and never personally sent money to the United States. We assume without deciding that there was error as to the money laundering offense and that the district court erred in applying the adjustment.

> "[T]he harmless error doctrine applies only if the proponent of the sentence convincingly demonstrates both (1) that the district court would have imposed the same sentence had it not made the error, and (2) that it would have done so for the same reasons it gave at the prior sentencing." To satisfy that high burden, there must be "evidence in the record that will convince us that the district court had a particular sentence in mind and would have imposed it, notwithstanding the error."[108]

Assuming arguendo that there was error, it would be harmless.[109] Under the Sentencing Guidelines, the offense level of a Group is determined by the highest offense level of the counts in the Group.[110] As calculated by the district court, Lazar's offense level was 43 with a guidelines range of life. But even assuming Lazar is correct that the money laundering count was miscalculated, and even removing the role adjustments for the offenses, the highest offense level would be 40, which, with a criminal history category I, would have a guidelines range of 292-365 months.[111] The district court imposed a 300-month sentence, which is within the range that Lazar would

---

[108] *Id.* (alteration in original) (internal citation omitted) (quoting *United States v. Ibarra-Luna*, 628 F.3d 712, 714, 718 (5th Cir. 2010)).

[109] *See United States v. Valdez*, 726 F.3d 684, 697 (5th Cir. 2013) (noting that harmless error review applies).

[110] U.S. Sent'g Guidelines Manual § 3D1.3(a) (U.S. Sent'g Comm'n 2024).

[111] *Id.*, Sent'g Table, ch. 5, pt. A.

23-40683
c/w No. 25-40038

have had without the managerial adjustment. However, "[t]hat the sentence would remain within the adjusted Guidelines range is insufficient to indicate harmlessness; 'the crux of the harmless-error inquiry is whether the district court *would* have imposed the same sentence, not whether the district court *could* have imposed the same sentence.'"[112]  The district court in this case also stated it "would have imposed the same sentence without regard to the applicable guideline range."  Any error was therefore harmless.[113]

* * *

For the foregoing reasons, we AFFIRM the district court's judgment.

---

[112] *Valdez*, 726 F.3d at 697 (quoting *United States v. Delgado-Martinez*, 564 F.3d 750, 753 (5th Cir. 2009)).

[113] *See id.* at 698 (finding that the district court would have imposed the same sentence when it said that even if the defendant's appeal came back for re-sentencing, he would still "fashion a sentence that will meet the 300-month sentence that I've given him"); *see also United States v. Vasquez*, 566 F. App'x 280, 280-81 (5th Cir. 2014) (unpublished) (recognizing the district court's statement that "even without the guideline system, which are advisory, it would be the same sentence," and holding: "Where the court makes an unequivocal statement such as the one here and the sentence given would be within the adjusted range, the error is harmless.").